## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

_____

TAYLOR BURKE as the Special,
Administrator of the Estate of
Thomas Gay, Deceased,

     Plaintiff,

     v.                   Case No. 20-cv-244-WPJ-SH

(1) CITY OF BARTLESVILLE;
(2) OFFICER JESSICA PITTS; and
(3) OFFICER WILLIAM LEWIS,

     Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY

**THIS MATTER** comes before the Court[1] upon Defendants' Motions[2] for Summary Judgment (**Docs. 68 & 69**). Defendant Officers assert qualified immunity; and Defendant City argues Plaintiff failed to state a viable municipal liability claim under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motions are not well-taken and must be **DENIED**.

## BACKGROUND

On June 1, 2020, Plaintiff—as the personal representative of Mr. Thomas Gay's estate—

---

[1] Chief United States District Court Judge William P. Johnson of the District of New Mexico was assigned this case as a result of the Tenth Circuit Order designating the undersigned to hear and preside over cases in the Northern District of Oklahoma.

[2] Defendant Officers filed one Motion for Summary Judgment (**Doc. 68**), while Defendant City filed its own (**Doc. 69**). Plaintiff filed Responses to both Motions (**Docs. 77 & 78**), whereafter Defendants filed Reply briefs (**Docs. 85 & 86**). Briefing was complete on March 31, 2023; however, Plaintiff filed a Motion to reopen discovery for the limited purpose of supplementing his response (**Doc. 87**). The Court granted this motion (**Doc. 93**). Then, Plaintiff filed a Supplemental Response (**Doc. 97**), and Defendant Officers filed a Reply (**Doc. 100**).

filed a federal civil rights lawsuit against Defendants.[3] Plaintiff's Complaint (**Doc. 2**) lists one cause of action—Claim I—for excessive use of force. *Id.* **at 8**. For Defendant Officers, Plaintiff alleges the officers violated the decedent's Fourth Amendment right to be free from excessive force. *Id.* **at 8–9**. For the City, Plaintiff alleges municipal liability based on policies, customs, and practices. *Id.* **at 9–11** (specifying liability for a failure to train and supervise).

This case revolves around the tasing and shooting of Mr. Thomas Gay by Bartlesville Police Department ("BPD") Officers on June 1, 2019. Plaintiff alleges the use of excessive—and deadly—force against Thomas Gay was unconstitutional. *See* **Doc. 2**. Plaintiff also alleges Defendant City acted with deliberate indifference—thereby causing the aforementioned injury. *Id.* Defendant Officers assert they are entitled to qualified immunity (**Doc. 68**). And Defendant City asserts the Complaint insufficiently alleges municipal liability (**Doc. 69**).

## LEGAL STANDARD FOR SUMMARY JUDGMENT

In reviewing a motion for summary judgment, the Court "construe[s] the facts in the light most favorable to the nonmovant and . . . draw[s] all reasonable inferences in its favor." *Palacios v. Fortuna*, 61 F.4th 1248, 1256 (10th Cir. 2023) (quoting *Est. of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1261 (10th Cir. 2022)). The Court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005). At this stage, the Court must decide: "is there a trial-worthy issue?"

Summary judgment is appropriate when the movant demonstrates there is "no genuine

---

[3] The Court refers to Defendants Pitts and Lewis as "Defendant Officers," in the plural. When discussing a singular officer, the Court uses Officer Pitts/Lewis. The municipal Defendant—the City of Bartlesville—is referred to as "Defendant City" or "the City." When discussing all of the Defendants together, the Court simply uses "Defendants."

dispute" about any "material fact." Fed. R. Civ. P. 56; *see also Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir. 1991). If the movant demonstrates "the absence of a genuine issue of material fact," then the burden shifts to "the non-movant to establish a genuine issue of fact." *Georgelas v. Desert Hill Ventures, Inc.*, 45 F.4th 1193, 1197 (10th Cir. 2022).

To defeat summary judgment, the nonmovant must set forth specific facts that would be admissible in evidence from which "a rational trier of fact could find for the nonmovant." *Williams v. Owners Ins. Co.*, 621 F. App'x 914, 917 (10th Cir. 2015) (unpublished) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). The nonmovant cannot rest on mere allegations, but instead "must bring forward specific facts showing a genuine issue for trial." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citation omitted). A "failure of proof concerning an essential element of the nonmoving party's case" will entitle the movant to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

What facts matter? At this stage, a "disputed fact is 'material' if it might affect the outcome of the suit under the governing law, and the dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Est. of Beauford*, 35 F.4th at 1261 (citation omitted). Of course, not all facts are material—nor are all disputes meaningful. *See Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").

Whenever the nonmovant does not dispute—*i.e.*, agrees with—the movant's factual statement, then that fact is admitted for purposes of the summary judgment motion. *Walker v. City of Orem*, 451 F.3d 1139, 1155 (10th Cir. 2006). The same is true when Plaintiff alleges additional facts in the Response and Defendants do not contest them. *See* N.D. Okla. LCvR56.1(c)–(e).

## LEGAL STANDARD FOR QUALIFIED IMMUNITY

Qualified immunity changes the nature of summary judgment—requiring a "different kind of review." *Shepherd v. Robbins*, 55 F.4th 810, 815 (10th Cir. 2022). This is because the very nature of qualified immunity is "unique." *Nelson v. McMullen*, 207 F.3d 1202, 1205–06 (10th Cir. 2000). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Where, as here, Defendants assert qualified immunity, this affirmative defense "creates a presumption that [the defendant is] immune from suit." *Est. of Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)). By asserting qualified immunity at summary judgment, "the burden shifts to the plaintiff, who must demonstrate on the facts alleged that (1) the defendant's actions violated his or her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged misconduct." *Est. of Beauford*, 35 F.4th at 1261 (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)). Ultimately, Defendants do not bear the "traditional burden of the movant for summary judgment" unless the Plaintiff is able to satisfy this two-part test. *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018) (quoting *Nelson*, 207 F.3d at 1206).

This is a "demanding standard." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The Tenth Circuit has explained:

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the particular conduct is clearly established. In the Fourth Amendment context, the

result depends very much on the facts of each case, and the precedents must squarely govern the present case.

*Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (quotations and citations omitted). In short, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The required analysis is not a "scavenger hunt for prior cases with precisely the same facts." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). But the state of the law must be clearly established—insofar as it provides "fair warning" to the Defendants that their alleged conduct was unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). Thus, the threshold inquiry a court must undertake is: "whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).

Here, the Plaintiff alleges the Defendants violated Mr. Thomas Gay's constitutional rights by tasing and shooting him without a reasonable basis to believe that he was armed, dangerous, or posing an immediate threat. **Doc. 77 at 20–22**; *see also* **Doc. 2** (Complaint). Plaintiff also contends the City is at fault for failing to adequately train or supervise Defendant Officers.

### UNDISPUTED MATERIAL FACTS[4]

Most of the facts are disputed, so the Court goes fact by fact—explaining which facts are

---

[4] The undisputed facts presented by Defendants are identical in both Motions. *Compare* **Doc. 68**, *with* **Doc. 69 at 5** ("See Defendant Officers' Miles Lewis and Jessica Pitts' Motion for Summary Judgment, Dkt. 68 filed contemporaneously herewith.").

In the Response, Plaintiff adds no "new" factual paragraphs—but disputes numerous facts presented by Defendants. New facts appear in Plaintiff's supplemental brief, though. *See* **Doc. 97**. Plaintiff argues that Officer Pitts' credibility creates a genuine issue of material fact to preclude summary judgment (**Doc. 97**). Defendant Officers disagree (**Doc. 100**). The Court does not incorporate these facts into the UMFs below—because the issue of Officer Pitts' credibility is an issue for a jury to resolve. There are enough factual disputes to deny summary judgment without taking a stance on this additional issue.

Finally, for ease of reading, *most* citations to supporting exhibits are omitted—and only the motions are cited. On occasion though, citations to the evidence are necessary.

agreed upon (and which aren't). If the latter, then the Court explains what piece of evidence from the filing supports—or at the very least could support—a different conclusion than that offered by Defendants.

After going through all sixty-two (62) facts, the Court then tells the story from Plaintiff's perspective—viewing the evidence in the light most favorable to the non-movant. In so doing, the Court resolves all the disputed facts in favor of Plaintiff, as required.

1. Officer Lewis is a certified police officer in the State of Oklahoma. *See* **Doc. 68 ("UMF") ¶ 1**. Since March 2016, Officer Lewis has worked for BPD. *Id.* He obtained his "CLEET"[5] certification in 2016. *Id.* Officer Lewis has completed a 12-week field training program—wherein he rode with (and was evaluated by) Field Training Officers. *Id.* He currently works as a detective, but in June 2019, he worked as a patrol officer. *Id.*

2. Prior to June 1, 2019, Officer Lewis received law enforcement training from BPD on use of force, laws of arrest, mental health training, drugs and narcotics, as well as search and seizure. **UMF ¶ 2**. He received other training as well. De-escalation training was accomplished through "training bulletins." **Doc. 77 at ¶ 2**. Additionally, Officer Lewis received "taser training"—but this was from a prior job as "a jailer for the City of Broken Arrow, Oklahoma," not BPD. **UMF ¶ 2** (citing **Doc. 68-2**); **Doc. 77 at ¶ 2**.

3. Officer Pitts is a certified police officer in the State of Oklahoma. **UMF ¶ 3**. Since August 2017, she has worked for BPD. *Id.* Officer Pitts currently works as a detective, but in June 2019, she worked as a patrol officer. *Id.* Officer Pitts obtained her CLEET

---

[5] Although neither party spells out what CLEET stands for, the Court notes that this is the acronym for Oklahoma's Council on Law Enforcement Education and Training. *See Attocknie v. Smith*, 798 F.3d 1252, 1258 (10th Cir. 2015).

certification in 2017. *Id.*

4. Prior to June 1, 2019, Officer Pitts received law enforcement training "including but not limited to use of force, including deadly force, laws of arrest, de-escalation, mental health training, drugs and narcotics and search and seizure." **UMF ¶ 4**. She also went through a 12-week field training program at BPD after obtaining her CLEET certification. *Id.*

5. On June 1, 2019, shortly before 8:00p.m., Mr. Willis Gay Jr. called 911 (BPD dispatch) and stated his adult son (Thomas Gay) was "evidently high on drugs or something" at his residence that "I need him removed." **UMF ¶ 5** (citing **Doc. 68-6 at 2**).[6]

   a. Plaintiff disputes this UMF—insofar as it "insinuat[es] that Willis called 911 to report that his son was high on drugs." **Doc. 77 at ¶ 5**. But the 911 transcript (**Doc. 68-6**) and CAD Report (**Doc. 77-3**) make clear that Mr. Willis Gay Jr. called 911 to have his son removed—and mentioned that his son was high. There is no dispute as to the fact as written—and none of the exhibits cited by Plaintiff (**Docs. 77-3 & 77-4**) support the notion that Mr. Willis Gay Jr.'s intent in calling 911 was anything other than to have his son removed.

6. Because of Thomas Gay's conduct, Willis Gay III "got a pocket knife to protect himself and WILLIS, JR. from THOMAS." **Doc. 68-20**; **UMF ¶ 6**.

   a. Plaintiff does not dispute this happened. **Doc. 77 at ¶ 6**. Instead, Plaintiff disputes the conclusion that the Defendant Officers were aware of Willis Gay III's actions—arguing that "neither of the officers were aware Thomas' brother had grabbed a knife." **Doc. 77 at ¶ 6**. Officer Lewis does not remember

---

[6] Willis Gay Jr. has two adult sons: (1) Willis Gay III, and (2) Thomas Gay, the decedent.

communicating with Willis Gay III.[7] The Court reasons that this fact is true and undisputed—and so is the fact that neither responding Defendant Officer was aware of Willis Gay III's actions.

7. Defendant Officers were radio assigned the call to Mr. Gay Jr.'s residence shortly before 8:00pm. **UMF ¶ 7.**

8. Somewhere between 3–5 minutes later Officer Lewis arrived. **UMF ¶ 8; Doc. 77 at ¶ 8** (citing **Doc. 77-3**).

9. Upon arrival Officer Lewis was met outside by Mr. Willis Gay Jr. and his other adult son Willis Gay III. **UMF ¶ 9.**

10. The Gays advised Officer Lewis that Thomas Gay had locked himself inside and was acting crazy. **UMF ¶ 10.** They explained that Thomas had lunged at Mr. Gay Jr. at one point. **UMF ¶ 10** (citing **Doc. 68-2**).

    a. This is disputed because Plaintiff provides evidence that the Gays told Officer Lewis that Thomas: (1) did not have a weapon, (2) keeps moving towards his back pocket, and (3) that nothing was in Thomas's back pocket. **Doc. 77 at ¶ 10** (citing **Doc. 77-4 at 22:10–22:23**).

11. Thomas Gay was "acting funny, got real paranoid, and kept turning the lights off and would not talk to Mr. Gay [Jr.] or Willis [Gay III]." **UMF ¶ 11.**

12. Officer Pitts arrived about 30 seconds after Officer Lewis. **UMF ¶ 12.** This is not disputed.

---

[7] *See* **Doc. 77-1 at 57:6–10**:
Q. Do you have any recollection of any communication at all with Willis Gay, the brother --
A. No.
Q. -- while you were out front?
A. No, sir.

    a.   There is a meaningful dispute, however, as to whether Officer Lewis ever informed Officer Pitts about what the Gays told him. **Doc. 77 at ¶ 12.**[8] *See also* **Doc. 85 at 2** (citing **Docs. 85-2 & 85-3**).

13. Officer Lewis allegedly asked if Thomas Gay had "any drug or mental health issues." **UMF ¶ 13** (citing **Doc. 68-2**).

    a.   This assertion conflicts with Mr. Willis Gay Jr.'s narrative. **Doc. 77 at ¶ 13** (citing **Doc. 77-4 at 30:16–19**).[9] This fact is disputed.

14. According to Defendants, Officer Pitts asked Mr. Gay Jr. if Thomas had any weapons on him, and he told them that he had made false moves by reaching to his back pocket. **UMF ¶ 14**.

    a.   But again, much like **UMF ¶ 10**, Plaintiff points out that Mr. Willis Gay Jr. told "Lewis and Pitts that Thomas was making 'false moves' towards his back pocket but explained that [Thomas] . . . was not in fact armed." **Doc. 77 at ¶ 14** (citing **Doc. 77-4 at 22:10–23**). Defendant Officers contend that what Mr. Willis Gay Jr. told them is "immaterial and irrelevant," **Doc. 85 at 2**, but it is not. Accordingly, this fact is disputed.

15. Mr. Gay Jr. told Defendant Officers that Thomas Gay locked himself in the house. **UMF ¶ 15**.

---

[8] Both Officer Pitts' and Officer Lewis' depositions hammer this point home. *See* **Doc. 77-5 at 75:20–76:1** ("I never heard the words he did not have weapons on his person."). *See also* **Doc. 77-1 at 52:16–20**:
Q. Up until this point in time, did Officer Pitts say anything?
A. I think I -- I informed her of the information that Mr. Gay [Jr.] had relayed to me prior to her arrival. But, no.

[9] Q Did the officer -- did either officer, the man or the woman, ask you if your son had mental health issues?
A. No.
Q. Did either officer ask you anything about your son?
A. Other than if he had -- had – was armed.

16. Mr. Willis Gay Jr. retrieved a house key and led Defendant Officers to another entrance into the home (through the garage). **UMF ¶ 16**; **Doc. 77 at ¶ 16**.

17. At the time of this incident, several "ordinances and statutes were in effect," including Bartlesville, Okla. City Ordinance §§ 12-107 and 12-19, as well as Okla. Stat. tit. 21 § 540. **UMF ¶ 17** (citing **Docs. 68-17, 68-18, 68-19**). Plaintiff does not dispute that these laws were in effect—however, Plaintiff explains "Defendants were not investigating Thomas for Resisting or Obstruction. The Defendants were there to aid in having Thomas removed from Willis' home." **Doc. 77 at ¶ 17** (citing **Doc. 77-5 at 79:17–21**).[10]

18. When Officer Lewis entered the house, he could see Thomas "standing in the living room, wearing a white T-shirt, gym shorts, sweating profusely, bug-eyed, eyes open wide, staring straight ahead, and he did not react to their presence." **UMF ¶ 18**.

19. Since Thomas had turned the lights out, and it was dusk outside, the lighting inside the house was poor. **UMF ¶ 19**. Plaintiff does not "necessarily disagree that certain parts of Willis [Jr.'s] home were dark." **Doc. 77 at ¶ 19**. At the same time, however, "the officers never asked Willis to turn the lights on or attempted to turn any lights on themselves." *Id.* (citing **Doc. 77-5 at 188:20–24**).[11] The Court reasons that although it

---

[10] Q. -- and Thomas was barricaded in the house --
A. Uh-huh.
Q. -- what crime did you suspect him of committing?
A. Trespassing.
Q. Is that a felony or a misdemeanor?
A. Misdemeanor
[11] Q. You said it was hard to see. You had a flashlight with you, right?
A. I believe so.
Q. You elected not to use it, right?
A. Yes.
Q. You could have flipped on a light switch, right? Nobody prevented you from touching the light switches, right?
A. Everything evolved way too quickly for any of that.

was dark, the lighting was not *too* poor—given the fact Defendant Officers did not: (1) turn the lights on, (2) request the lights be turned on, or (3) utilize their flashlights.

20. According to Officer Lewis, "[i]n the poor lighting, [he] saw Thomas holding what he believed was some type of longbow with articles draped across it." **UMF ¶ 20**.

    a. This fact is disputed. For one, Officer Pitts stated Thomas was not holding a bow. **Doc. 77 at ¶ 20 (Doc. 77-5 at 93:4–5)** ("He was holding something in a shield-like manner."). Mr. Willis Gay Jr. echoes this fact—stating Thomas never held a bow. **Doc. 77 at ¶ 20 (Doc. 77-4 at 32:6–19)**.[12]

21. Plaintiff's Complaint (**Doc. 2 at ¶ 28**) states that "Thomas was 'armed' only with a toy recurved bow." **UMF ¶ 21**.

    a. There is no dispute that the Complaint says this. But, for the same reasons described above in **UMF ¶ 20**, the Court agrees with Plaintiff—"the brief reference to the bow in Plaintiff's Complaint is based solely on the incorrect information in Lewis' report." **Doc. 77 at ¶ 21**.

22. According to Officer Pitts, "[i]n the poor lighting, Officer Pitts thought [Thomas] was holding something with both hands which he held up like a shield." **UMF ¶ 22**. Plaintiff quibbles with the language of Officer Pitts' affidavit compared to her deposition. *Compare* **Doc. 68-4**, *with* **Doc. 77-5**.

---

[12] Q. At any point in time while the police were at your house that day on June 1, 2019, was Thomas ever holding a bow?
A. No, the -- there was a small bow about I think foot and a half long or so that was decorating the wall or I was going to make a decoration along the wall and I had picked that stuff up. Like I said I had went through the house to pick up anything that he might pick up that looked threatening and that was about the time the officer started showing up. So I just set that stuff down in a chair next to the -- the front door.
Q. And I just need to make sure I'm clear on this. At no time that the officers and you were in the house did Thomas ever have that bow in his hand?
A. No.

23. Defendant Officers claim that "Mr. [Willis] Gay [Jr.] saw Thomas holding what he thought was a ventriloquist dummy and he thought it was some kind of picture and was holding them like a shield up in front of him." **UMF ¶ 23**.

    a. This is mostly accurate. But the verbiage matters—Mr. Willis Gay Jr. did not *think* it was a ventriloquist dummy and picture; he unequivocally stated that is what Thomas was holding. **Doc. 77 at ¶ 23; Doc. 77-4 at 23:1–3; Doc. 68-10 at 10**.

24. According to Defendants, Officer Lewis tried to communicate with Thomas by saying "Hey, man, how's it going?" **UMF ¶ 24**.

    a. Plaintiff counters—arguing that instead of de-escalating the situation, Officer Lewis "immediately escalated the encounter when he pointed his Taser at Thomas within a matter of seconds." **Doc. 77 at ¶ 24**. According to Officer Pitts, only one command was given prior to Officer Lewis' deploying of the Taser. **Doc. 77-5**. The de-escalation (or lack thereof) is disputed. The Defendant Officers' belief that Thomas was "under the influence" of something is undisputed.

25. The toxicology analysis of Thomas, post-mortem, showed he had methamphetamine and amphetamine in his system at the time of the incident. **UMF ¶ 25**.

    a. Plaintiff argues that "Pitts and Lewis were not aware of the results" when they encountered Thomas. **Doc. 77 at ¶ 25**. This is true; but Plaintiff did not dispute that the officers "believed Thomas was under the influence" during the encounter. *Id.* **at ¶ 24**. Accordingly, the Court does not give any consideration to the 20/20 hindsight of the post-mortem toxicology—and only relies on the

Defendant Officers' beliefs. *See* **UMF ¶ 24**.

26. Defendants state that persons "under the influence of methamphetamine can be unpredictable and erratic." **UMF ¶ 26**.

   a. Plaintiff agrees with the general assertion—but argues Defendant Officers "did not know Thomas had methamphetamine in his system." **Doc. 77 at ¶ 26**. The Court only considers what the officers believed in that moment (that is, Thomas was high on something). And, in their training and experience, the Defendant Officers believe that persons under the influence of methamphetamine act unpredictably.

27. According to Officer Lewis, his plan was to "detain Thomas, keep him in sight, make the scene safe, and then further assess the situation." **UMF ¶ 27**. Although Plaintiff disputes the "need" to make the scene safe—that is not a genuine dispute as to a material fact. Plaintiff offers no evidence to rebut Officer Lewis' plan.

28. This fact is disputed for a few reasons.

   a. According to Defendants, "[Officer Lewis] told Thomas to put the bow down, but he did not comply." **UMF ¶ 28**. Then Officer Lewis said, "Put the bow down or I am going to Tase you." ***Id.*** There were only a few seconds between each of the commands given. ***Id.***

   b. As previously discussed, however, Thomas was not holding a bow. *See* **UMFs 20–21**. (At least not according to Officer Pitts or Mr. Willis Gay Jr.). Additionally, Plaintiff provides evidence indicating that Officer Lewis' first command to Thomas was "drop whatever you ha[ve]." **Doc. 77 at ¶ 28** (quoting

**Doc. 77-5 at 96:2–5**).[13] The next command (if actually given) was, "I need you to put that down or I'm going to tase you." **Doc. 77 at ¶ 28** (quoting **Doc. 77-1 at 69:3–7**). Again, there is a dispute as to whether Officer Lewis ever mentioned the word "bow" during these commands (in addition to the previously discussed dispute about whether Thomas ever even held a bow). There is also a dispute between Defendant Officers as to how many commands were given and what was said.

29. Next, Defendants assert that "Officer Lewis' concern was that Thomas might swing the bow he believed he was holding." **UMF ¶ 29**.

    a.  This fact is disputed—again, neither Officer Pitts nor Mr. Willis Gay Jr. say Thomas was holding a bow. **Doc. 77 at ¶ 29**.

30. At this time, Officer Lewis was about six feet away from Thomas, and Officer Pitts was to his left. **UMF ¶ 30**.

31. This fact is disputed.

    a.  According to Defendants, "Thomas then began moving back down the hallway, acting defiant-like." **UMF ¶ 31**.

    b.  Plaintiff points out the Defendant Officers' stories "contradict one another." **Doc. 77 at ¶ 31**. Officer Lewis states that Thomas began walking backward prior to the deployment of the Taser. *Id.* (citing **Doc. 77-1 at 75:3–10 & 76:1–7**). Officer Pitts stated that Officer Lewis deployed the Taser before Thomas started walking backward. *Id.* (citing **Doc. 77-5 at 95:20–96:5**).

---

[13] In Officer Lewis' deposition (**Doc. 77-1**), he described the situation as follows:
So when I went in and addressed him and he initially didn't have a reaction, I said, "Hey, man, how's it going?" Nothing. I said, "I need you to put that down." And nothing. I told him, "I need you to put that down or I'm going to Tase you." *Id.* **at 68:13–20**.

32. The parties agree that Thomas was large—approximately six feet tall and weighing 200 pounds. **UMF ¶ 32**. Defendant Officers claim that Mr. Willis Gay Jr. was "concerned about Officer Lewis since he was 'skinny' and thought he might need help." ***Id.*** Plaintiff disputes the inference but not the fact.[14] Accordingly, this fact is undisputed.

33. Much like in **UMF ¶ 19**, Defendants assert "[t]he hallway was extremely dark." **UMF ¶ 33**. Again, Plaintiff does not dispute that "parts of Willis' home were dark," **Doc. 77 at ¶ 19**, but questions *why* the officers did not: (1) turn the lights on, (2) request the lights be turned on, or (3) utilize their flashlights. **Doc. 77 at ¶¶ 19 & 33**. Ultimately, the Court concludes the hallway was dark—as that is not disputed.

34. According to Officer Lewis, he was concerned about "[Thomas] getting out of his line of sight and obtaining a weapon from the bedroom or getting something from his waistband or pocket while he could not see him." **UMF ¶ 33**. But, as mentioned in **UMF ¶ 31**, Officer Lewis may have already deployed the Taser on Thomas. **Doc. 77 at ¶ 34** (citing **Doc. 77-5 at 95:20–96:5**). This fact is not disputed because disproving Officer Lewis' belief would require the Court to make a credibility assessment.

35. This fact is also disputed.

   a. According to Defendants: "Thomas was defiant and "'wasn't going to go.'" **UMF ¶ 35**.

   b. Plaintiff points out that Mr. Willis Gay Jr. did not think Thomas was defiant before the Taser was deployed. **Doc. 77 at ¶ 35**.

36. *When* Officer Lewis tased Thomas is disputed. **UMF ¶ 36**.

---

[14] According to Mr. Willis Gay, "[Thomas] was big and [a] wrestler and – and football and everything." **Doc. 77-4 at 23:21–22**. He explained that the officers "[are] going to need help . . . . if -- if they tried to get ahold of my son." ***Id.* at 23:18–21**.

    a.  Officer Lewis stated he initially tased Thomas while he was walking backwards down the hall. **Doc. 77 at ¶ 36** (citing **Doc. 77-1 at 76:1–18**). Officer Pitts states that Thomas was still in between the living room and hallway when Officer Lewis first deployed the Taser. **Doc. 77 at ¶ 36** (citing **Doc. 77-5 at 97:10–16 & 98:23–25**).

37. Thomas reacted to the Taser, but it did not incapacitate him as it should have. **UMF ¶ 37**. This is correct—but also lacking important context.

    a.  As Plaintiff points out, Officer Lewis did not use the Taser correctly. **Doc. 77 at ¶ 37** (citing **Doc. 77-10**). The "Taser Report" makes clear that for one-third of the time the weapon was deployed there was "no connection." **Doc. 77-10 at 1 ¶ 3**. Plaintiff also points out that Officer Lewis was never trained on the use of a Taser while employed at BPD. **Doc. 77 at 37** (citing **Doc. 77-11 at 63:21– 24 & 69:1–3**).

38. Officer Pitts got on her radio and announced "taser deployed" to let dispatch and other officers know she and Officer Lewis were in a confrontation. **UMF ¶ 38**. Plaintiff does not dispute this.

    a.  Plaintiff disagrees with the assertion in the second sentence in this paragraph: "Pursuant to her training, she drew her gun from hits [*sic*] holster, since Officer Lewis had deployed his Taser." **UMF ¶ 38**. Plaintiff points out that BPD's Taser Policy does not "dictate[] that a firearm is to be drawn after a Taser is deployed." **Doc. 77 at ¶ 38** (citing **Doc. 77-12**). The Court agrees—this second sentence is disputed.

39. Defendants argued that "[b]ased on Officer Lewis' training and experience, following

an unsuccessful Taser attempt a second attempt needs to be made or you can try and subdue the suspect by going hands on and using physical control holds." **UMF ¶ 39**.

    a. This fact is disputed for a few reasons. For one, Officer Lewis had zero training on the use of a Taser while employed at BPD. **Doc. 77 at ¶ 39** (citing **Docs. 77-1 & 77-11**). Second, BPD's Taser Policy states that if the initial tasing "appears to be ineffective in gaining control of an individual, the officer should evaluate the situation and consider certain factors before additional applications of the TASER device." **Doc. 77 at ¶ 39** (quoting **Doc. 77-12**). The Court concludes that "a second attempt" *need not* be made, as claimed by Defendants.

40. Thomas then moved through a doorway to a bedroom located to the right at the end of the hallway. **UMF ¶ 40**. Plaintiff does not dispute this fact.

    a. Plaintiff asserts that the Taser Report (**Doc. 77-10**)[15] suggests that Officer Lewis tased Thomas twice prior to when he entered the bedroom. Even if true, that fact does not put **UMF ¶ 40** into dispute.

41. According to Defendants, Officer Lewis proceeded down the hallway and came into the doorway and told Thomas to show his hands and get on the ground. **UMF ¶ 41**.

    a. This fact is in dispute—as Officer Pitts testified that Officer Lewis did not say anything to Thomas in the bedroom. **Doc. 77 at ¶ 41** (citing **Doc. 77-5 at 123:2–12**).[16]

---

[15] Based on the Taser Report, there were four trigger pulls—(1) the first as at 8:06:49pm, (2) the second at 8:06:52pm, (3) the third at 8:07:00pm, and (4) the fourth at 8:07:06pm. *See* **Doc. 77-10 at 9 ¶ 2.1**.

[16] Officer Pitts' deposition (**Doc. 77-5 at 123:6–21**) recounts this moment as follows:

Q. At that point in time on the time space continuum, you didn't say anything to Thomas?
A. Correct.
Q. Did Officer Lewis say anything to Thomas?
A. No, I don't believe so.
Q. What was Thomas doing? What did you physically observe him doing?

42. Officer Lewis went to the right of the doorway when he entered the bedroom and Officer Pitts went to the left. **UMF ¶ 42**.

43. The shades in the bedroom were shut and the bedroom was dark. **UMF ¶ 43**.

44. Thomas started to go to the ground, but then quickly came back up to his feet. **UMF ¶ 44**.

45. Officer Lewis then deployed the second cartridge of his Taser at Thomas, and he reacted as if in pain, but the Taser did not incapacitate him. **UMF ¶ 45**.

   a. Plaintiff "seriously disputes the timeline." **Doc. 77 at ¶ 45**. *See also* n.13 (noting the timeline of the four Taser deployments). This fact is deemed disputed. Perhaps Officer Lewis thought he deployed the Taser for the second time—even though it was the third or fourth usage. According to Defendant Officers, the first Taser use was at **UMF ¶ 31** and the second is here. Given the preceding dozen facts, however, the Court concludes that more than three seconds elapsed. *See* **Doc. 77 at ¶ 45** ("It is near impossible that everything outlined in DSMUF Nos. 37–44 occurred within the three seconds between the two Taser deployments.").

46. Defendants assert that "Officer Lewis then ran to Thomas to restrain him physically by grabbing him and using his Taser in drive stun or contact mode but that was also not effective, and Thomas pushed him away and then redirected his attention to Officer Pitts." **UMF ¶ 46**.

   a. This is mostly agreed upon—but not wholly undisputed. Officer Lewis did, in

---

A. So the best of my recollection, that second Taser was deployed like as I was stepping into the room.
Q. Was there any command given or statement made prior to the second Taser deployment?
A. Not that I can recall, no.

fact, run to Thomas to restrain him. *See* **Doc. 77 at ¶ 46**. The issue is (once again) focused on the operability of the Taser. The Taser was operational—even though Officer Lewis did not successfully use the "drive stun or contact mode." *Id.* (citing **Doc. 77-10**). Thus, the assertion that the "drive stun or contact mode" was not "effective" is a disputed factual matter. Additionally, there is conflicting evidence as to where Thomas redirected his attention—was it: (1) "to Officer Pitts," **UMF ¶ 46**, or (2) "to the door." **Doc. 77 at ¶ 46**.

47. According to Defendants, "Officer Pitts had backed up to an open closet that was to the left of the bedroom door, and Thomas was facing her as he came towards her." **UMF ¶ 47**.

    a. This description of Thomas Gay's movements—as enunciated by Officer Pitts (**Doc. 68-4**)—is disputed by Mr. Willis Gay Jr. (**Doc. 77-4**) who states Thomas was simply trying to make it to the door.

48. Thomas really went belligerent and yelled out that he was going to kill the officers. **UMF ¶ 48**. This fact is undisputed. *See* **Doc. 77 at ¶ 48**.

    a. The Court notes that Defendant Officers are not the proponent of this fact. Instead, Mr. Willis Gay Jr. is. *See* **Doc. 68-10**. But this Court "must view the events from the perspective of the officer[s]." *Thomas v. Durastanti*, 607 F.3d 655, 667 (10th Cir. 2010). And the Defendant Officers did not know (or hear) this fact. *See* **Doc. 77-1; Doc. 77-5**.[17] So even though this happened, it raises a

---

[17] Officer Lewis' deposition states the following:
"Q. At any point in time during any of the encounter, was he verbal?
A. No."
**Doc. 77-1 at 78:20–22**. In Officer Pitts' deposition, she stated that "At some point during this event I lost my hearing." **Doc. 77-5 at 123:23–124:10**.

legally impermissible inference: given that the Defendant Officers' actions cannot be "judged . . . with the 20/20 vision of hindsight." *Flores v. Henderson*, 101 F.4th 1185, 1193 (10th Cir. 2024). Facts unknown to Defendant Officers cannot be imputed to them for purposes of summary judgment. *See Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023) ("[F]acts unknown to officers at the moment they use force are not relevant to the qualified-immunity analysis.").

49. According to Mr. Gay Jr., Thomas was in a rage like he had never seen before. **UMF ¶ 49**. This fact is not meaningfully disputed; but warrants further clarification. This UMF should read that: "According to Mr. Gay Jr., Thomas was in a rage like he had never seen before—after the officer shot him the second time with the Taser." **Doc. 77 at ¶ 49** (citing **Doc. 77-4 at 78:8–15**). This more accurately represents what Mr. Willis Gay Jr. said—not what Defendants want him to have said.

50. According to Defendants, "As Thomas continued towards Officer Pitts, he made a rapid motion with his right hand coming up from his right waist band area holding a black object that Officer Pitts believed was a gun." **UMF ¶ 50**.

    a. This fact is disputed in full. For one, neither Defendant Officer mentioned "a black object" in their incident reports. *See* **Docs. 77-6 & 77-13**. In Officer Pitts' interview, she mentions a gun (**Doc. 77-15**). But the reference to a gun—or remote control—was omitted from Officer Lewis' interview (**Doc. 77-14**). The 2023 Declarations (**Docs. 68-2 & 68-4**) are the first time that both Defendant Officers describe a "black object" that was believed to be a "gun." Obviously, this is contradicted by their prior statements (**Docs. 77-1 & 77-4**). The Court

20

cannot weigh[18] these conflicting statements; and instead, simply finds this fact is disputed.

b. This fact must be measured against **UMFs ¶¶ 10, 14, 28–29**. Earlier, the Court agreed that it was undisputed Mr. Willis Gay Jr. told Defendant Officers that Thomas kept making "false moves" by reaching to his back pocket. **UMF ¶ 14**. Mr. Willis Gay Jr. informed Defendant Officers of Thomas' "false moves," upon arrival (at which time he also told them that Thomas was unarmed). **Doc. 77 at ¶¶ 10, 14, 28–29**.

c. As it stands, the Court acknowledges Defendant Officers would testify about seeing a "black object." But whether that object was a gun, knife, or remote control is disputed. So, too, is whether Thomas had any black object in his hand. *See infra* ¶ 51.

d. In their Reply (**Doc. 85 at 7**), Defendant Officers argue that Officer Lewis testified to seeing a "black TV remote" in his deposition. But Exhibit 3 does not show deposition page 90—the cited reference. This unincorporated evidence cannot be considered. *See Sumler v. Boeing Co.*, 143 F. App'x 925, 928 (10th Cir. 2005) (unpublished) (noting that facts cannot be disputed by evidence "not place[d] in the record"); *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 921 (10th Cir. 2004) (producing admissible evidence is required).

e. Additionally, Plaintiff's Supplemental Response calls Officer Pitts' credibility into question (**Doc. 97**). Plaintiff argues that such a conclusion would not be a

---

[18] A court may disregard an affidavit submitted at summary judgment that contradicts an affiant's prior sworn testimony if it "constitutes an attempt to create a sham fact issue." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). But for the fact Officer Pitts previously mentioned a gun in her interview, the Court would have disregarded the inconsistencies in these Declarations.

"credibility determination," but instead a "material question regarding the officer's credibility." **Doc. 97 at 10** (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1166 (10th Cir. 2008)). Because **UMF ¶ 50** is already disputed, the Court need not decide if Officer Pitts' credibility is genuinely in doubt.

51. Defendants contend that "Officer Lewis also saw a black object in Thomas' right hand just before the shooting." **UMF ¶ 51**.

   a. For similar reasons outlined above, this fact is disputed. *See* **Doc. 77 at ¶ 52**[19] (citing **Docs. 77-1 & 77-4**). *See* **UMF ¶ 50.e.** (citing **Doc. 97**).

52. Here, Defendants assert that "At that point in time Officer Pitts was in immediate fear of serious bodily harm or death for herself and Officer Lewis and decided deadly force was warranted. This situation was tense, uncertain and rapidly evolving. She did not have time to give a verbal warning. Officer Pitts then fired her gun at Thomas." **UMF ¶ 52**.

   a. This fact is also disputed. *See also* **UMF ¶ 50.e.** (citing **Doc. 97**). Plaintiff re-alleges an additional fact—"Thomas was unarmed." *Id.* Plus, this UMF asserts a legal conclusion. *See* **Doc. 77 at ¶ 53**.

53. Consistent with Officer Pitts' Declaration (**Doc. 68-4**), Defendants assert that "Officer Pitts' bullet struck Thomas in the front of his right thigh, and he went down to one knee then immediately came back up and Officer Pitts fired a second time, hitting him in the chest, and Thomas fell to the floor." **UMF ¶ 53**.

   a. This is disputed by the Officer Lewis' deposition testimony. **Doc. 77 at ¶ 54**

---

[19] After Plaintiff disputes **UMF ¶ 50** in **Doc. 77 at ¶ 50**, the numbering appears off by one paragraph. For example, the Response (**Doc. 77**) disputes **UMF ¶ 51** in **¶ 52**. This continues until **UMFs ¶¶ 56–57**. The Court has reconciled this issue by comparing the respective briefings. Thus, the numbering convention above is not a typo—but a correct citation.

(citing **Doc. 77-1 at 21**).[20] *See* **UMF ¶ 50.e.** (citing **Doc. 97**).

54. As Thomas approached Officer Pitts the right side of his body was toward the side of the room where a window had an air conditioning unit in it. **UMF ¶ 54**. This fact is not meaningfully disputed—despite Plaintiff framing it as a "dispute[d]" fact. *See* **Doc. 77 at ¶ 55**.

55. According to Defendants, "There was nowhere in the room where Mr. Gay [Jr.] could be located to see the right side of Thomas' body in the seconds before the shooting, as there is a cot and dresser occupying the space on that side of the bedroom." **UMF ¶ 55**.

    a. But Mr. Willis Gay Jr. testified to the contrary (**Doc. 77-4**). Thus, this fact is disputed. *See* **Doc. 77 at ¶ 56**.

56. During the encounter in the bedroom Thomas was in continuous motion until he fell to the floor after the second shot. **UMF ¶ 56**.

57. After Thomas fell to the ground after being shot Officer Lewis approached him and started to handcuff him, and one cuff was placed on Thomas' left hand, but then Officer Lewis decided he needed to assess his injuries immediately. **UMF ¶ 57**.

58. Defendants claim that "Officer Pitts called 'shots fired' several times over the radio and called for EMS." **UMF ¶ 58**. Plaintiff disputes this fact. Upon review of the evidence, the Court rephrases this fact as follows:

---

[20] Q. How long do you believe there was between the first discharge and the second discharge?
A. Maybe a second.
Q. It was quick; right?
A. It was quick.
Q. Bang, bang?
A. Uh-huh.
[Q]. Yes?
[A]. Yes. Probably more "bang, bang."
*See* **Doc. 77-1 at 89:2–11**.

a. Officer Pitts called "shots fired" several times over the radio at 8:07:40. *See* **Doc. 77 at ¶ 58** (citing **Doc. 77-3 at 2**). Then, approximately two minutes later, Defendant Officers called for EMS. ***Id.***

59. The events from when Defendant Officers first encountered Thomas until he was shot, evolved rapidly in a matter of seconds. **UMF ¶ 59**.

60. From the time Officer Lewis arrived at the Gay residence until the shooting was announced over the radio, only three minutes and forty-one seconds had elapsed. **UMF ¶ 60**. As phrased, this fact is not meaningfully disputed. *See* **Doc. 77 at ¶ 60**.

a. Plaintiff disputes the timeline—arguing that the encounter "evolved much quicker than three minutes." **Doc. 77 at ¶ 60**. But this is not what the **UMF** alleges. The elapsed time from arrival to radio call is undisputed.

61. At the scene of the shooting during the investigation by the OSBI, a black television remote was found on the floor just above the head of Thomas Gay. **UMF ¶ 61**. As phrased, this fact is not meaningfully disputed. *See* **Doc. 77 at ¶ 61**.

a. Instead, Plaintiff raises additional facts. For one, Mr. Willis Gay Jr. testified there was "not a remote directly next to Thomas' body immediately after the shooting." **Doc. 77 at ¶ 61** (citing **Doc. 77-4**). But this is not what **UMF ¶ 61** purports. Likewise, whether "OSBI . . . collected" the remote is not alleged in **UMF ¶ 61**. For what it's worth, though, the remote was not collected. *See* **Doc. 77 at ¶ 61** (citing **Doc. 77-17**).

62. According to Defendants, "Mr. Bryan Chiles is an employee of Axon Taser deposed by Plaintiff during this litigation and is a senior investigative engineer for the company that manufactured the Taser used by Officer Lewis. Mr. Chiles performed a forensic

24

download of the Taser used by Officer Lewis in the incident with Thomas. According to Mr. Chiles, during Officer Lewis' attempts to tase Thomas, Thomas was exposed to only a combined 3.8 seconds of effective electric current from the Taser. This amount of exposure would be insufficient to cause any physiologic injury or damage." **UMF ¶ 62**. The effective use of the Taser by Officer Lewis is disputed—given the Taser Report's revelation that the Taser was functional, but not properly used. *See* **Doc. 77-10**; *see also* **UMF ¶ 37**.

* * *

The facts at this summary judgment[21] stage tell the following story:

On June 1, 2019, law enforcement personnel from BPD were dispatched to the home of Mr. Willis Gay Jr. Defendant Officers arrived on scene shortly after 8:00pm. Upon arrival, Mr. Gay Jr. informed Defendant Officers that Thomas was behaving erratically (and he may have been under the influence of drugs). Mr. Willis Gay Jr. wanted Thomas removed from his home.

Prior to entering the home, Mr. Willis Gay Jr. told Defendant Officers that Thomas was unarmed—but warned them that Thomas keeps making furtive movements towards his back pocket.

Willis Jr. then grabbed a key, opened the door, and walked Defendant Officers into his house. Once inside, Defendant Officers saw that Thomas was sweating profusely and bug-eyed. He did not react to their presence.

As everyone entered the house, it was clear that Thomas was holding an innocuous object (apparently a ventriloquist doll). Officer Lewis immediately told Thomas to drop (or put down)

---

[21] Here, the Court "view[s] the evidence in the light most favorable to the non-moving party," and resolves "[a]ll disputed facts . . . in favor of the party resisting summary judgment." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (citations omitted).

the object he was holding. At about the same time, Officer Lewis pointed his Taser at Thomas. Without any further commands, Officer Lewis tased Thomas. And Officer Pitts unholstered and drew her service weapon.

In response, Thomas walked backwards into a bedroom. He started to lie on the ground, but then stood back up. At this point, Officer Lewis tased Thomas (at least) once more. But the Taser failed to incapacitate Thomas—due to user error—and a brief skirmish took place. Officer Lewis tried to grab Thomas, but Thomas pushed him away. Thomas then moved towards the bedroom door—which Officer Pitts perceived as a threat. As Thomas walked towards the door, he moved his hand towards his back pocket—at which time Officer Pitts shot Thomas twice in quick succession. Thomas was killed within 3 minutes of Defendant Officers' arrival.

Obviously, these facts are only the Cliffs Notes version from Plaintiff's point of view. But several questions[22] remain unanswered (given that the parties do not agree on the facts):

1. What did the Defendant Officers know (and when)?

   a. Did they know that Thomas Gay was unarmed?

   b. If not, what did they think he was holding?

2. Did the Defendant Officers escalate the situation?

   a. Was Thomas enraged prior to being tased (or only after)?

3. Did Thomas reach for his hip/waistband area?

   a. And if so, was this in a manner consistent with Mr. Willis Gay Jr.'s description of Thomas' behavior?

4. What was Thomas holding when he was shot (if anything)?

5. Were the Defendant Officers properly trained?

---

[22] Plaintiff argues that fact issues preclude summary judgment. *See* **Doc. 77 at ¶ IV**. The Court agrees.

a. And who (if anyone) knew that Officer Lewis was not trained on the Taser in accordance with BPD policy?

The Court notes there is conflicting evidence on several important issues. These disputed facts leave triable issues for a jury's consideration.

## DISCUSSION

A Fourth Amendment excessive-force claim requires a complaining party to show "*both* that a seizure occurred and that the seizure was unreasonable." *Durastanti*, 607 F.3d at 663 (internal quotations omitted). Because Mr. Thomas Gay was shot, there is no question a seizure occurred. *See Torres v. Madrid*, 592 U.S. 306, 309 (2021). The Court, therefore, turns to the question whether the seizure and force were reasonable. *See generally Graham v. Connor*, 490 U.S. 386 (1989).

This reasonableness inquiry focuses on "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Phrased differently, a plaintiff must prove that the officers' actions were "objectively unreasonable." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). A court must review the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Est. of Valverde ex rel. Padilla v. Dodge*, 967 F.3d 1049, 1060 (10th Cir. 2020) (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1313 (10th Cir. 2009)).

When a court analyzes the actions from the perspective of "a reasonable officer," there are two guiding legal principles. The first consideration is *Graham*—as mentioned above. *See Flores*, 101 F.4th at 1193 (listing the three *Graham* factors). Nested within these *Graham* factors are the *Larsen* subfactors. *See Est. of Larsen*, 511 F.3d at 1260. The *Larsen* factors help guide a court in

evaluating the seriousness of a threat. *See Arnold v. City of Olathe, Kan.*, 35 F.4th 778, 789 (10th Cir. 2022). The second consideration is the "totality of the circumstances." [23] *See Est. of George v. City of Rifle, Colo.*, 85 F.4th 1300, 1317 (10th Cir. 2023).

In this case, the Court first finds that Defendant Officers are not entitled to summary judgment because there are many material facts in dispute. *See infra* ¶ I. Then, the Court addresses the qualified immunity issue—breaking down each *Graham* factor into its own subparagraph. *See infra* ¶¶ II.A.–II.C. Third, the Court addresses factually similar cases to see if the law was clearly established. *See infra* ¶ III. And finally, the Court explains why Defendant City is not entitled to summary judgment. *See infra* ¶ IV.

## I. Defendant Officers Are Not Entitled to Summary Judgment

As detailed above, there are disputed material facts regarding: (1) what information Defendant Officers knew leading up to the shooting, (2) whether the Defendant Officers unreasonably created the need to use deadly force, and (3) what Mr. Thomas Gay was doing with his hands in the bedroom. Candidly, there are numerous factual disputes in the evidence presented by the parties. *See* **Doc. 77 at 19** (noting that the facts in Defendants' unsworn declarations contradict other testimony). Each side presented sufficient evidence—such that a rational trier of fact could resolve the issues either way. *See Celotex Corp.*, 477 U.S. at 325. So much so that the Court concludes "the evidence presents a sufficient disagreement [that] require[s] submission to a jury." **Doc. 68 at 19** (quoting *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007)).

In the analysis below, the Court views "the facts and their reasonable inferences in the light

---

[23] Even though *Graham* held that reasonableness depends on "the totality of the circumstances," 490 U.S. at 396, four courts of appeals "cabin *Graham*." The Supreme Court recently granted certiorari to resolve the issue. *See Barnes v. Felix*, 91 F.4th 393 (5th Cir. 2024), *cert. granted*, 2024 U.S. LEXIS 3066 (Oct. 4, 2024) (No. 23-1239) (Question presented: "Whether courts should apply the 'moment of the threat' doctrine when evaluating an excessive force claim under the Fourth Amendment.").

most favorable to the nonmovant." *Lazy S Ranch Props., LLC v. Valero Terminaling & Distrib. Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024). From this pro-Plaintiff perspective, as is required by Rule 56, the issue to be resolved is whether Defendant Officers used reasonable force (or excessive force) to apprehend an unarmed potential misdemeanant. Based on the evidence and pleadings, the Court concludes a reasonable jury could find Defendants liable for excessive force.

## II. Defendant Officers Are Not Entitled to Qualified Immunity

Although no longer required[24] in qualified immunity analysis, "it is often beneficial to first assess [the] constitutional violation before considering clearly established law." *Rosales v. Bradshaw*, 72 F.4th 1145, 1151 (10th Cir. 2023) (citing *Pearson*, 555 U.S. at 236).

Because the public officials have raised a qualified immunity defense, the Plaintiff bears the burden of proving that Defendants' conduct violated the law *and* that the relevant law was

---

[24] In 2001, the Supreme Court stated the specific ordering of the two-part qualified immunity test was required. *See Saucier v. Katz*, 533 U.S. 194 (2001). But then, in *Pearson*, 555 U.S. at 236, the Court held that lower courts could decide either prong first.

Over the last fifteen years, practitioners and courts alike have argued that *Pearson* destroyed the two-step process—and has allowed courts to simply answer the "clearly established" prong without reaching the harder constitutional question. *See, e.g., Cox v. Wilson*, 971 F.3d 1159, 1161 (Lucero, J., joined by Phillips, J., dissenting from denial of rehearing en banc) (citing John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 FLA. L. REV. 851, 852 (2010) ("[D]etermining whether an officer violated 'clearly established' law has proved to be a mare's nest of complexity and confusion. The circuits vary widely in approach, which is not surprising given the conflicting signals from the Supreme Court.")); *The Supreme Court, 2020 Term—Leading Case: Qualified Immunity–Hope Obviousness Standard–Taylor v. Riojas*, 135 Harv. L. Rev. 421, nn.4–7 (2021) ("Qualified immunity has come under fire from academics, judges, practitioners, legislators, and the public alike."); William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45, 48 (2018) (noting "the doctrine has [] come under increasing outside criticism"); David R. Cleveland, *Clear as Mud: How the Uncertain Precedential Status of Unpublished Opinions Muddles Qualified Immunity Determinations*, 65 U. MIAMI L. REV. 45, 63 (2010) ("The Supreme Court has never spelled out what sources of law may clearly establish the law."); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018); Karen Blum, *Section 1983 Litigation: The Maze, the Mud, and the Madness*, 23 WM. & MARY BILL RTS. J. 913, 934 n.135 (2015) (collecting cases where courts avoided the difficult question—and instead decided only the "clearly established" prong); *cf.* Advisory Opinions, *Solicitor General 9000*, THE DISPATCH (Nov. 9, 2023) (downloaded using iTunes) (citing https://hasthesupremecourtfixedqualifiedimmunitydoctrineyet.com).

Even though the Court needn't answer these questions in any specific order, the Court uses the traditional approach (of first assessing the constitutional violation before considering the clearly established prong). The old framework makes more intuitive sense—particularly when denying qualified immunity.

clearly established when the alleged violation occurred. *See Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997) (citing *Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988)).

Here, Defendant Officers seek summary judgment based on an invocation of qualified immunity (**Doc. 68 at 21**). But again, in viewing the facts in the light most favorable to the nonmovant, Plaintiff has demonstrated the Defendant Officers' conduct violated Mr. Thomas Gay's constitutional rights (**Doc. 77 at 32**). And, as discussed *infra* ¶ III, this constitutional right was clearly established (**Doc. 77 at 32**). The law is clear—Defendant Officers were not entitled, under these circumstances, to shoot first and ask questions later.

* * *

The Court now applies the *Graham* factors to the instant case (comparing, of course, the factual similarities and dissimilarities to other cases). *See generally Shepherd*, 55 F.4th at 815; *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008).

### A. The first **Graham** *factor: Thomas Gay's crimes were not severe*

Defendant Officers were dispatched to Mr. Willis Gay Jr.'s residence to remove Mr. Thomas Gay. **UMF ¶ 5** (citing **Docs. 68-6 & 77-3**). Thomas was suspected of being "high on drugs or something." **UMF ¶ 5**.

This was not a serious crime. In fact, BPD labeled this call as "SUSPICIOUS PERSON/VEHICLE." **Doc. 77-3**. The "Notes" describing the nature of this call make it more akin to a welfare check. *Id.* ("thomas gay is there and is high or something/ wants him removed"). Nevertheless, based on the 911 call, the Court reasons that the Defendant Officers may have had probable cause to believe the encounter involved misdemeanor trespass (**UMF ¶ 17**).[25]

---

[25] Bartlesville City Ordinance § 12-107 relates to trespassing. *See* **Doc. 68-17**.

For the Court's analysis, it does not matter if Mr. Thomas Gay was suspected of committing a misdemeanor or no crime at all (**Doc. 68 at 26–28 & Doc. 77 at 28**). Either way—this low threat call weighs against the Defendant Officers' use of force. *See Lee v. Tucker*, 904 F.3d 1145, 1149 (10th Cir. 2018) (noting there are "many cases" in which the Tenth Circuit has "held that the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor"); *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012); *Koch v. City of Del City*, 660 F.3d 1228, 1247 (10th Cir. 2011); *Fogarty*, 523 F.3d at 1160; *see also Perea*, 817 F.3d at 1202 (holding that because "the officers were performing a welfare check" and were not looking for a criminal suspect, this "weighs heavily against the use of significant force"). Even if probable cause for misdemeanor trespassing existed, the severity of Thomas' crime weighs against the use of "anything more than minimal force." *Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016).

It's a truism: force should be reduced for misdemeanors. *See Morris*, 672 F.3d at 1195; *Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir. 2009). Thus, the first *Graham* factor weighs in Plaintiff's favor (even if Mr. Thomas Gay was suspected of trespassing).

### B. The second **Graham** *factor: Defendant Officers did not reasonably perceive an immediate and lethal threat*

Although none of the *Graham* factors are dispositive, the Tenth Circuit has stated the second factor is "undoubtedly the 'most important' and fact intensive." *Arnold*, 35 F.4th at 788 (citation omitted). This is particularly true when "the issue is whether an officer reasonably believed [they] faced a threat of serious physical harm." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 792 (10th Cir. 2021) (quoting *Est. of Valverde*, 967 F.3d at 1061). The Tenth Circuit looks at four criteria when analyzing the second *Graham* factor, namely: (1) whether officers ordered the suspect to drop the weapon, (2) whether any hostile motions were made with the weapon towards the officers, (3) the distance separating the officers and the suspect, and (4) the manifest intentions

of the suspect. *Est. of Larsen*, 511 F.3d at 1260. These *Larsen* factors are discussed below.

In addition to the *Larsen* factors, the second *Graham* factor requires a court to consider if law enforcement unreasonably created the need to use force. *See infra* ¶ II.B.5.

### 1. Defendant Officers ordered Mr. Thomas Gay to drop something

Although the exact nature and timing of the commands from Defendant Officers to Mr. Thomas Gay are disputed—they agree that Officer Lewis told Mr. Thomas Gay to "drop" or "put down" something. *See* **UMF ¶ 28; Doc. 77 at ¶ 28** (quoting **Doc. 77-5 at 96:2–5**). The issue is *what* was Mr. Thomas Gay holding?

According to Officer Lewis, Thomas was holding a bow. **UMF ¶ 20**. Officer Pitts thought Thomas was holding a shield. **UMF ¶ 22**. And Mr. Willis Gay Jr. says Thomas was holding a ventriloquist dummy and a picture. **UMF ¶ 23**.

Because Thomas Gay did not drop the item after this first (and only command), Officer Lewis deployed the Taser (**UMFs ¶¶ 28, 31, 36**). And Officer Pitts drew her service weapon. **UMF ¶ 38**. No other commands were given during the remainder of the encounter.[26] *See* **UMFs ¶¶ 36–62**; *see also* **Doc. 77 at 29**.

### 2. No hostile motions were made with any weapon

For the remainder of the *Larsen* factor analysis, the Court breaks down the encounter into two discreet interactions. The Court acknowledges that Plaintiff "is asserting that the Defendants interaction with Thomas on June 1, 2019[,] was one continuous event," **Doc. 77 at 21**, but the *Larsen* analysis needs to be bifurcated for clarity.

---

[26] On one hand, Defendant Officers assert that Officer Lewis told Thomas to show his hands and get on the ground. **UMF ¶ 41** (citing **Doc. 68-2**). But this fact is in dispute—because Officer Pitts testified that only one command (to "put that down") was given prior to deploying the Taser. **Doc. 77-5 at 95:20–96:5**.

Additionally, Officer Pitts stated that Officer Lewis did not say anything to Thomas in the bedroom. **Doc. 77 at ¶ 41** (citing **Doc. 77-5 at 123:2–12**).

As presented in the pleadings—and the attached evidence—the Court reasons that Mr. Thomas Gay was not holding a weapon. He was not holding a weapon when Defendant Officers entered the home. Nor was he holding a weapon when he was tased. And finally, he was not holding a weapon when he was shot twice.

### a. *Initial entry through deployment of Taser*

According to Officer Lewis, he was concerned that Thomas was "getting out of his line of sight and obtaining a weapon from the bedroom or getting something from his waistband or pocket while he could not see him." **UMF ¶ 33**. Outside of this fact, the Court cannot tell what prompted the deployment of the Taser. *See* **UMF ¶ 36**. Plaintiff's version says Officer Lewis almost immediately drew his Taser.

Officer Lewis states he tased Thomas as he was walking backwards down the hall. **Doc. 77 at ¶ 36** (citing **Doc. 77-1 at 76:1–18**). Officer Pitts states that Thomas was still in between the living room and hallway when Officer Lewis first deployed the Taser. **Doc. 77 at ¶ 36** (citing **Doc. 77-5 at 97:10–16 & 98:23–25**). Plaintiff's version notes Officer Lewis used the Taser almost immediately (and repeatedly). He did so, even though Defendants admit "Thomas did not make any hostile motions towards Defendant Officers at the time Officer Lewis used his [T]aser on him." **Doc. 68 at 33**.

After Officer Lewis tased Thomas, Officer Pitts "drew her gun." **UMF ¶ 38**.

Thomas then "moved through a doorway to a bedroom located to the right at the end of the hallway." **UMF ¶ 40**. Defendant Officers followed Thomas into the bedroom. **UMF ¶ 42**.

Thomas started to go to the ground—but then, "quickly came back up to his feet." **UMF ¶ 44**. Officer Lewis deployed the Taser again (**UMF ¶ 45**).

### b. *Post-Taser through shooting*

It is undisputed that Thomas pushed Officer Lewis away as he tried to "restrain him physically." **UMF ¶ 46**. But his next movement is disputed—because evidence exists showing that Thomas ran: (1) at Officer Pitts (**UMF ¶ 46**), or to the door (**Doc. 77 at ¶ 46**). *See also* **UMF ¶ 47 & Doc. 77 at ¶ 47**.

According to Defendants, "As Thomas continued towards Officer Pitts, he made a rapid motion with his right hand coming up from his right waist band area holding a black object that Officer Pitts believed was a gun." **UMF ¶ 50**. But, as mentioned above, this fact is disputed. Plaintiff points out that neither Defendant Officer mentioned "a black object" in their incident reports. *See* **Docs. 77-6 & 77-13**. And Officer Lewis did not mention any such object in his interview (**Doc. 77-14**).

Although Defendant Officers contend that "Officer Lewis also saw a black object in Thomas' right hand just before the shooting." **UMF ¶ 51**. Because of this object and movement, Officer Pitts shot Thomas (**UMF ¶ 53**). Defendants assert that after Officer Pitts shot Thomas, he "went down to one knee then immediately came back up"—at which point Officer Pitts fired a second shot. **UMF ¶ 53**.

But Officer Lewis' deposition testimony expressly disavows the idea that Thomas was holding anything in his hand. *See* **Doc. 77 at ¶ 52** (citing **Doc. 77-1 at 80:1–6 & 85:24–86:5**). Officer Lewis' deposition also supports Plaintiff's contention that Thomas was shot twice—"bang, bang." *See* **Doc. 77 at ¶ 54** (citing **Doc. 77-1 at 21**).

There is, then, more than a "scintilla of evidence" to support Plaintiff's position that Mr. Thomas Gay didn't make any hostile motion with a weapon. *See Anderson*, 477 U.S. at 252. And certainly, the pro-Plaintiff version of the evidence does not support the notion that "Thomas drew and pointed the object like one would draw and point a gun." **Doc. 68 at 34**.

### 3. This encounter took place in close proximity

#### a. Initial entry through deployment of Taser

Prior to the tasing, Defendant Officers were about six feet away from Thomas. **UMF ¶ 30**. Everyone was in a hallway—and Thomas may (or may not) have been moving backward. *See* **Doc. 77** (citing **Docs. 77-1 & 77-5**). At some point, Thomas moved "through a doorway to a bedroom located to the right at the end of the hallway." **UMF ¶ 40**. Defendant Officers followed Thomas into the bedroom, **UMF ¶ 42**, with Officer Lewis going "to the right of the doorway" and Officer Pitts "to the left." **UMF ¶ 42**.

#### b. Post-Taser through shooting

The remainder of the encounter took place in the bedroom (**UMFs ¶¶ 42–61**). Thus, the shooting necessarily occurred in close proximity.

### 4. Mr. Thomas Gay's "manifest intentions"

Defendant Officers argue a few points on this topic.

First, according to Defendants, Officer Lewis' use of the Taser was reasonable (**Doc. 68 at 33**) because he "reasonably believed Thomas was holding a bow and would not follow his order to drop it." **Doc. 68 at 33**. This fact is disputed, though. Thomas may have been holding a bow, or a ventriloquist dummy, or a shield. Is someone who was holding a doll (or shield or doll) manifesting an intent to harm? The answer is "no." Whatever Thomas may have been holding, his intentions cannot be viewed as objectively violent. A reasonable officer on scene would not have assessed Thomas' holding of some nonlethal object as hostile or malevolent—especially given the lack of commands from law enforcement. Thomas' noncompliance with the singular command given—to "drop" the object—would not demonstrate any manifest intention to a reasonable officer. *See* **UMF ¶ 28; Doc. 77 at ¶ 28; Doc. 77-5 at 96:2–5**.

Next, Defendants argue that Officer Pitts could glean Thomas' intentions because of his "rage and him yelling that he was 'going to kill them.'" **Doc. 68 at 35**. But neither of the Defendant Officers was aware of what Thomas said until this court case. *See* **UMFs ¶¶ 48 & 48a**. On June 1st—this fact was not at play. The Court disregards Defendant Officers' attempt to justify their use of force with facts unknown to them at the time of the shooting. *See Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014) ("[T]he pertinent question for determining . . . entitlement to qualified immunity depends on the facts that were known at the time.").

What remains, then, is Officer Pitts' argument that Thomas was in a "rage" and "coming towards [her] with what she believed to be a gun." **Doc. 68 at 35**. But in order for something to be manifest, it must be objectively apparent. *See Est. of Taylor*, 16 F.4th at 770. And Defendant Officers do not agree that Thomas had anything in his hands. They do not agree that the "black object" mentioned in later statements was a gun. It could have been a knife (a conclusion Defendants appear to argue in the alternative). *See* **Doc. 68 at 27** (citing **Doc. 68-21**). Moreover, Mr. Willis Gay Jr. disputes that Thomas was "coming towards [Officer Pitts]."

During the entire 200 second encounter, Defendant Officers say Thomas was both holding—and not holding—various items. They cannot agree on whether he made any hostile motions. It cannot be said, then, that Thomas manifested any hostile intent. Nor can it be said that a reasonable officer would have assessed Thomas' actions in the manner Defendant Officers did. *See Palacios*, 61 F.4th at 1260.

Applying the objective reasonableness standard, the Court concludes the fourth *Larsen* factor (as well as the previous three) supports Plaintiff's position. Officer Lewis unsuccessfully tased Thomas several times. After being tased, Thomas did not give himself up for arrest. (Assuming, of course, that an arrest for trespassing was legitimate at that point in time). Instead,

36

he walked backwards. Went into a bedroom. Was tased again. And then he reached towards his back pocket while moving towards Officer Pitts.

Would a reasonable officer fire two shots at someone in this scenario? How can malicious intent be imputed when the responding offers are informed upon arrival that the individual is unarmed but keeps reaching towards his back pocket? *See* **Doc. 68 at 27** ("Officer Pitts then asked Mr. Gay [Jr.] if Thomas had any weapons on him, he told her 'no,' but '. . . he makes one of those false moves and he reaches at his back pocket.'"); *see also* **Doc. 68-4; Doc. 68-12 at 22:13–17; Doc. 77-4 at 22:10–23; Doc. 77-7 at 10–11**.

Under these circumstances, Thomas' actions, at the precise moment Officer Pitts used lethal force, cannot reasonably be viewed as manifesting an immediately threatening intention. Neither can Thomas' earlier actions with respect to Officer Lewis. A reasonably jury could find that Mr. Thomas Gay did not pose an immediate threat to the officers. *See King v. Hill*, 615 F. App'x 470, 476 (10th Cir. 2015) (unpublished).

\* \* \*

In evaluating the *Larsen* factors, the Court notes that Defendant Officers cannot agree on: (1) what commands—if any—were given, (2) what Thomas was holding before he was tased, and (3) what Thomas was holding before he was shot.

Undeterred, Defendant Officers argue that Thomas's noncompliance and furtive movements justified multiple Taser deployments and the use of lethal force. But these assertions by Defendant Officers are not supported by the record. *See infra* ¶ III.

### 5. Defendant Officers escalated the situation

Equally important in this second factor is whether the Defendant Officers unreasonably created the need to use force. *See Flores*, 101 F.4th at 1194–95; *see also Allen v. Muskogee, Okla.*,

119 F.3d 837, 840 (10th Cir. 1997).

"The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Allen*, 119 F.3d at 840 (citing *Sevier*, 60 F.3d at 699). The record here supports the conclusion that Defendant Officers acted recklessly during the encounter.

First, upon entering the house, Officer Lewis immediately[27] unholstered his Taser and pointed it at Thomas. *See* **Doc. 77 at 33**; *see also* **Doc. 77-5 & Doc. 77-7 at 12**. Seconds later, and without any further commands, he deployed the Taser. *See* **Doc. 77-5**. Because Officer Lewis discharged the Taser, Officer Pitts drew her service weapon (**UMF ¶ 38**). These actions set the tone for the encounter—and escalated, rather than deescalated, the situation.

The second *Graham* factor weighs in Plaintiff's favor.

### C. The third **Graham** *factor: Mr. Thomas Gay was not evading arrest*

Another factor in evaluating the reasonableness of the officers' use of force is whether Thomas was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. This review "looks at the facts and circumstances as they existed in the moment the force was used, while also taking into consideration the events leading up to that moment." *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020).

The final *Graham* factor weighs in favor of the Plaintiff.

As noted above, the nature of the call is important. Although Defendant Officers could

---

[27] Two minutes elapsed from Defendant Officers arrival until the Taser was drawn. *Compare* **Doc. 77-3** (noting that both officers were on scene at 8:04:28), *with* **Doc. 77-10** (showing Taser was armed at 8:06:48). But this timeline doesn't account for **UMFs ¶¶ 13–18**, wherein: (1) Officer Lewis and Mr. Willis Gay talked, (2) Mr. Willis Gay retrieved a key, and (3) Mr. Willis Gay led Defendant Officers into the house. These acts took some amount of time.

likely have arrested[28] Thomas for a petty misdemeanor offense, the reason for the call was more like a welfare check. Thus, Thomas' immediate actions should not be viewed as resisting arrest (**Doc. 77 at 31–32**).

Seconds into the encounter, Officer Lewis tased Thomas in the hallway. He tased Thomas again in the bedroom. And then tased Thomas yet again on "stun" mode (because the Taser was not used correctly).

Maybe Thomas was resisting arrest during the tasing—but how would Thomas know he was under arrest? Only one command was given to Thomas at the beginning of the encounter. *See* **Doc. 77 at ¶ 41** (citing **Doc. 77-5 at 123:2–12**). Defendant Officers did not communicate anything to Thomas once they were in the bedroom. *See* **UMF ¶ 41**. Nor did Officer Pitts give a verbal warning before shooting Thomas. *See* **UMF ¶ 52**.

Even though Defendant Officers did not successfully detain Thomas, it cannot be said that Thomas was evading arrest or attempting to flee.

\* \* \*

After considering the three *Graham* factors, four *Larsen* subfactors, and the totality of the circumstances, the Court easily concludes Plaintiff sufficiently alleges that Defendant Officers used unreasonable force.

### III. These Facts Show That a Clearly Established Constitutional Violation Occurred

Plaintiff alleges that Defendant Officers violated Mr. Thomas Gay's Fourth Amendment

---

[28] Defendant Officers argue that "Thomas' actions obstructed the investigation of Officer Lewis . . . and constituted resisting under the city ordinance." **Doc. 68 at 30**. But this argument misses the forest through the trees. In fact, two Tenth Circuit cases undermine Defendant Officers' argument about stacking up additional charges for resisting arrest. *See Bond v. City of Tahlequah*, 981 F.3d 808, 819–20 (10th Cir. 2020), *Est. of Taylor*, 16 F.4th at 764; *cf.* We The People, *A Conversation with Justice Neil Gorsuch on "The Human Toll of Too Much Law"*, NAT'L CONST. CTR. (Sept. 19, 2024) (downloaded using iTunes) (quoting Stalin's police chief, "Show me the man and I'll show you the crime").

rights by using excessive force against him. Specifically, Plaintiff argues Defendant Officers use of deadly force was excessive and objectively unreasonable (**Doc. 2 at ¶ 1**).

To prevail, the Plaintiff must show that: (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Walton v. Gomez (In re Est. of Booker)*, 745 F.3d 405, 411 (10th Cir. 2014).

Applying this framework, qualified immunity does not shield Defendant Officers. Given all the factual disputes, Plaintiff has shown that there is a triable issue for a jury (and that a reasonable jury could find these facts support a violation of a constitutional right). The first prong is satisfied.[29]

Next, the Court concludes the constitutional right at issue was "clearly established." To show clearly established law, the burden is on the Plaintiff "to identify a case where an officer acting under similar circumstances as [the Defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam). There, however, is no requirement to "hunt for a prior case with identical facts." *Weigel*, 544 F.3d at 1154. But the relevant decision must predate the cause of action *and* be a decision of either the Supreme Court or Tenth Circuit. *Est. of Booker*, 745 F.3d at 427.

### A. Is this case distinguishable?

Defendant Officers argue there are no "Supreme Court or Tenth Circuit case[s] in which an officer is found to have violated the Fourth Amendment rights of a suspect whom officers had probable cause to believe based on Thomas' behavior, non-compliance, and potential for a

---

[29] Even when responding to a dangerous situation, law enforcement may not shoot an unarmed and unthreatening suspect. This fact is even more true here—because Defendant Officers were responding to a welfare check (or maybe a trespassing misdemeanor). *See Walker*, 451 F.3d at 1160 (finding it clearly established that an officer could not shoot a suspect who "was not charging the officer and had made no slicing or stabbing motions toward him").

weapon." **Doc. 68 at 37**.

Defendant Officers, however, misconstrue the facts—claiming Thomas was "non-compliant, had demonstrated crazy and erratic behavior, was high on methamphetamine, and could produce a weapon or gain control of one." **Doc. 68 at 37**. Again, at this stage, the Court "resolve[s] factual disputes and draw[s] reasonable inferences in the nonmovant's favor." *Chase Mfg. v. Johns Manville Corp.*, 84 F.4th 1157, 1168 (10th Cir. 2023).

Moreover, Defendant Officers' argument that Thomas' ability to gain control of a weapon is unpersuasive—everyone *could* always grab something. The correct inquiry is whether an officer is reasonably concerned that the suspect already "possesse[s] something that could and might be used as a weapon against him." *Wilson v. City of Lafayette*, 510 F. App'x 775, 778 (10th Cir. 2013) (unpublished). Here, the degree of Thomas' noncompliance is disputed. Although Defendant Officers assert multiple commands were given, Plaintiff cites to evidence indicating only one command was given. And again, at this stage, the Court views the evidence in Plaintiff's favor.

On these facts, as presented from Plaintiff's point of view, the law does not permit the deployment of a Taser on someone who is simply "erratic" and "high on methamphetamine." *See Emmett v. Armstrong*, 973 F.3d 1127, 1137–38 (10th Cir. 2020) (summarizing cases involving the use of a Taser); *see also Lee*, 904 F.3d at 1150 ("[T]he use of a Taser without warning on a non-resisting misdemeanant violates the Fourth Amendment's excessive force protections."); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666–67 (10th Cir. 2010) (discussing the use of a Taser); *Casey*, 509 F.3d at 1286 (same). Rather, Thomas was a nonviolent misdemeanant who received one command from law enforcement. Plus, Plaintiff's version of the facts make clear that Defendant Officers drew and aimed their Taser and gun at Thomas before he reached for his pocket. *See Cook v. Peters*, 604 F. App'x 663, 667–69 (10th Cir. 2015) (unpublished) (finding

excessive force in the "takedown" when the suspect's crime was minor, and he posed "little immediate threat").

In their Reply, Defendant Officers claim that the use of the Taser was reasonable (**Doc. 85 at 8–11**). The Court disagrees. The near-immediate Taser drawing demonstrates that Defendant Officers escalated—instead of de-escalated—the situation. The context of the Taser plays into the Court's analysis of the second *Graham* factor—not as an independent cause of action. That's because this case is not about "two distinct claims against the officers . . . . Plaintiff[] is asserting that the Defendants interaction with Thomas on June 1, 2019[,] was one continuous event." **Doc. 77 at 21**; *see also* **Doc. 2 at ¶ 1**.

In sum, Defendant Officers provide this Court with zero factually similar cases. Instead, Defendant Officers argue that "the cases cited by Plaintiff can be distinguished from the instant case." **Doc. 85 at 12**. Again, the Court disagrees—and finds a laundry list of on-point cases.

### B. Similar Cases

There are several cases pre-June 1, 2019, supporting Plaintiff's contention that Thomas' constitutional right to be free from deadly force was clearly established. *Carr v. Castle*, 337 F.3d 1221, 1227 n.7 (10th Cir. 2003). In so doing, Plaintiff relies on several cases[30] wherein the Tenth Circuit found it was clearly established that officers cannot use deadly force against a person who posed no threat. The Court now addresses the most salient cases.

### 1. Hastings v. Barnes, 252 F. App'x 197 (10th Cir. 2007) (unpublished)

The relevant facts are of this case are as follows: One morning, Todd Hastings called

---

[30] The cases cited in Plaintiff's Response are: (1) *Bond*, 981 F.3d 808, (2) *Est. of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019), (3) *Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished), and (4) *Allen*, 119 F.3d 837. *See* **Doc. 77 at 22–27 & 33**.

    The Court does not discuss *Bond*—because it was decided after the shooting. The remaining cases provided by Plaintiff are compared to the facts at play here (in varying lengths).

Oklahoma's Family and Child Services. He reported being suicidal (even telling an intake working

he planned to commit suicide). 911 was called—and the 911 operator contacted police to conduct

a well-being check. The officers knew that Hastings was suicidal; but were told that he was

"non-violent and was not known to be armed." *Id.* at 199. Law enforcement knocked on Hastings'

front door. And he opened the door halfway. The officers described Hastings' behavior as

"nervous," "agitated," and "a little evasive." *Id.* Hastings then slammed the front door on an

officer's foot and ran into a bedroom. Officers followed.

In the bedroom, Hastings picked up "a Samurai sword." *Id.* One of the officers drew his

weapon and yelled "knife." After hearing this, the other officers drew their weapons. The officers

told Hastings to put the sword down—but he did not comply.

Law enforcement deployed pepper spray on Hastings—but it did not affect him. Instead,

of dropping the sword, Hastings then began moving toward the officers. *Id.* at n.5. The officers

shot him four times.

The entire incident lasted less than four minutes. *Id.* at n.7.

This case stands for the proposition that "an officer acts unreasonably when he aggressively

confronts an armed and suicidal/emotionally disturbed individual without gaining additional

information or by approaching him in a threatening manner." *Id.* at 206. Rather than "attempt to

talk to [Hastings] and calm him, they cornered him in his bedroom . . . pepper-sprayed him, thereby

further upsetting [Hastings] and precipitating the need to use deadly force." *Id.*

\* \* \*

Here, much like in *Hastings*, Defendant Officers: (1) responded to a nonviolent welfare

check, (2) escalated the situation, (3) cornered Thomas, and (4) precipitated the need to use deadly

force. Defendant Officers did not attempt to talk to Thomas. They did not try and calm him down.

Instead, they immediately (or nearly instantaneously) drew their Taser and firearm. That they could not engage in this sort of behavior was clearly established.

### 2. Allen v. Muskogee, Okla., 119 F.3d 837 (10th Cir. 1997)[31]

In this case, Terry Allen went to his sister's home after an altercation with his family. He took guns and ammunition with him.

The altercation was reported to law enforcement—advising police that "Mr. Allen was armed and had threatened family members." *Id.* at 839. Prior to law enforcement's arrival, dispatch radioed that Mr. Allen was threatening to commit suicide.

Upon arrival, law enforcement saw Mr. Allen sitting in the driver's seat of his vehicle (with one foot outside of the vehicle) and a gun in his right hand. The officer on scene repeatedly ordered Allen to drop the gun.

Officers approached the vehicle. In so doing, two officers approached the driver's side door to seize the gun while another officer approached the passenger side door. Allen reacted by pointing the gun at one officer—then swinging the gun toward the other two officers.

Shots were exchanged. In total, twelve rounds were fired into the vehicle—four of which

---

[31] It is clearly established that law enforcement cannot sprint at a suicidal person, scream at him, and unreasonably create the need to use force. *See Arnold*, 35 F.4th at 789; *Est. of Bleck v. City of Alamosa*, 643 F. App'x 754, 756–57 (10th Cir. 2016) (unpublished) (Gorsuch, J.); *Walker*, 451 F.3d at 1160.

　　As an aside, however, the undersigned holds the view that the officers use of force in *Allen* appears justified. Although the decision itself simply reversed the district court's grant of summary judgment based on genuine and material disputes of fact; the Tenth Circuit has relied on *Allen*'s "holding" time and time again for (*perhaps*) a broader proposition than the opinion itself. It appears *Allen* is the "go to" case for evaluating whether officers unreasonably created (or escalated) the need to use force under step two of the *Graham* analysis. *See, e.g., Flores*, 101 F.4th at 1194; *Est. of Taylor*, 16 F.4th at 762; *Arnold*, 35 F.4th at 789.

　　Notwithstanding the arguments in support of the officers' use of force in *Allen*, the case provides strong Tenth Circuit precedent for the conclusion that, in the instant case, the Defendant Officers are not entitled to qualified immunity for their use of force against Thomas Gay—because they unreasonably escalated the situation. Of course, this Court's qualms with *Allen* are largely due to its omission of any qualified immunity discussion. *See Pauly v. White*, 874 F.3d 1197, 1223 (10th Cir. 2017) (finding *Allen* is "of little help" on qualified immunity); *Lord v. Hall*, 520 F. App'x 687, 693 (10th Cir. 2013) (unpublished) (noting that "there is no indication the defendants in <u>Allen</u> raised a qualified immunity defense").

struck Allen (and killed him).

The total encounter lasted ninety seconds.

Summary judgment was improper in this case. The Tenth Circuit found that there were genuine issues of material fact as to whether the officers' actions recklessly precipitated the need to use deadly force. *Id.* at 840–41. As such, *Allen* established that applying lethal force after deliberately or recklessly manufacturing the need to do so in such a scenario is a clearly established constitutional violation. *See Bond*, 981 F.3d at 825 (citing the "clearly established law" from *Allen*), *rev'd on other grounds*, 595 U.S. 9 (2021).

\* \* \*

As in *Allen*, Defendant officers knowingly confronted a potentially irrational (and intoxicated/high) subject. He was unarmed (or, perhaps, armed with a bow, doll, or shield). None of these are lethal—even at short-range. Defendant Officers drew weapons immediately and cornered Thomas in his bedroom. Clearly, they precipitated the need to use deadly force. And the prohibition on force in such a situation was clearly established.

### 3. Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d 1150 (10th Cir. 2010)

In *Zia Tr. Co.*, police responded to a father's call about a dispute with his adult son. The responding officer knew that the son—Megan—had mental health issues. Dispatch also reported that there were firearms at the residence.

When the officer arrived at the residence, he saw the suspect sitting in a van. The officer may (or may not) have had his gun drawn upon approach. The officer yelled for Megan to exit the vehicle—but the vehicle "jumped" about a foot forward. *Id.* at 1153. In response, the officer fired a single shot into the vehicle (striking Megan in the neck).

Megan gout out of the vehicle and began running towards the officer. The officer then used his Taser to subdue the suspect.

Later, Megan died as a result of the gunshot wound.

The district court's denial of qualified immunity was affirmed. The Tenth Circuit ruled that the officer "violated clearly established law when he used deadly force" because he did not have "probable cause to believe there was a serious threat of serious physical harm to himself or others." *Id.* at 1155.

* * *

Applying *Zia* to the case at hand, this Court cannot say, viewing the record in a light most favorable to the Plaintiff, that Defendant Officers acted reasonably. First, according to Willis Gay Jr.'s testimony, Officer Lewis drew his Taser almost immediately. **UMF ¶ 24** (citing **Doc. 77-5**). There are no facts alleged by either side that Defendant Officers identified themselves as law enforcement. It is unclear, at least under the Plaintiff's alleged facts, whether Thomas ever knew why law enforcement was there or what they wanted him to do. Second, Plaintiff alleges—and there is some support in the record—that Thomas was not holding a weapon. In fact, three different objects are alleged to have been held by Thomas. **UMFs ¶¶ 20–23**. What he was holding is a hotly disputed material fact. Finally, although Officer Pitts testified in that she saw Thomas with a gun, what exactly she saw is disputed. **UMFs ¶¶ 50–51**.

Accordingly, reading the record in the light favorable to the Plaintiff, it is not clear that Thomas manifested an intent to harm Defendant Officers. Of course, this analysis only accounts for the Plaintiff's version of events (a version which a jury may later reject). Nevertheless, under this version, the Court agrees that the Plaintiff has met its burden of showing a constitutional violation.

### 4. King v. Hill, 615 F. App'x 470 (10th Cir. 2015) (unpublished)

In this case, officers received a report about a mentally ill man making threats against his spouse. Law enforcement also knew that King was "off his meds." *Id.* at 471. On several occasions, the reporting party told dispatch there were no known weapons in the house.

Because of this call, a "domestic disturbance" dispatch call went out to the local Sheriff's Office. Three officers responded to the call, spoke to the subject's wife for around 20 seconds, and then approached the house.

There was disagreement about what King was wearing, where he was standing, and what he was holding. *Id.* at 471–72. One witness said, "it was clear that King did not have anything in his hands." *Id.* at 472. Nevertheless, the officers believed that King "could have had a 'long gun' under [his] jacket." *Id.* Because of this suspected potential weapon, one of the officers retrieved his AR-15 from the patrol vehicle.

Several commands were given (although there is not agreement on specifics). King responded by shouting at the officers. He may have even moved toward them. Moments later, one of the officers fired the first shot at King. According to this officer, he then fired additional shots because King "started to hunker down" (which the officer perceived as an attempt "to make himself smaller and more difficult to hit."). *Id.* at 473.

The district court denied qualified immunity, and the Tenth Circuit affirmed. At the time of the shooting, "the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others." *Id.* at 477. The officer's justification for shooting was that he reasonably believed King was armed with a long gun. But the facts, considered in the light most favorable to the Plaintiff, did not support the officer's justification. *Id.* at 475.

* * *

The *King* analysis is applicable here, too. For one, the same foundational principle that "police may not seize an "unarmed, nondangerous suspect by shooting him dead," *Tennessee v. Garner*, 471 U.S. 11 (1985), limits Defendant Officers' use of deadly force. And, as in *King*, there is conflicting testimony about what provoked the shooting. There is also conflicting testimony concerning Thomas' actions (especially about whether he was armed). And even though it is *possible* that Defendant Officers were mistaken about the nature of Thomas' "threat," denial of qualified immunity on summary judgment is proper. *See King*, 615 F. App'x at 477–78. The law was clearly established that an officer cannot shoot an unarmed man who does not pose any actual threat.

* * * * *

There are other cases that support Plaintiff's position (although the Court declines to cite them in the same manner).

Starting at the beginning of the encounter—a reasonable officer knows that the immediate use of a Taser against a misdemeanant (without warning) is unreasonable. *Casey*, 509 F.3d at 1286. Although it is debatable what warning(s)—if any—were given, a reasonable jury could find that Defendant Officers did not have any reason to believe lesser force (or additional verbal commands) could not exact compliance. *See* **UMFs 28–31**. In fact, if only the one command was given to "drop" the item—Officer Lewis' actions violated clearly established law. *See Lee*, 904 F.3d at 1150 n.1 ("[T]he law is 'clearly established' that an officer cannot 'use his Taser on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning.'"); *see also* **UMFs ¶ 25 & 28**; *cf.* **Doc. 77-5**. According to Officer Pitts and Mr. Willis Gay Jr., the only command was to "drop" an item. There was arguably no admonition that

noncompliance would result in Thomas being tased. And there is no evidence that Thomas was ever told he was detained or, alternatively, that he was not free to move about the house. Thus, Defendant Officers were not entitled to use the Taser, without warning, on a non-resisting misdemeanant. *See Cavanaugh*, 625 F.3d at 666–67 (citing *Casey*, 509 F.3d at 1279–82).

After escalating the situation with Thomas, Defendant Officers (specifically Officer Pitts) shot Thomas two times without warning. Such deadly force was unreasonable—much like the officer who shot Leonard Zuchel four times and killed him (all for carrying fingernail clippers that could have been a knife). *See Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989). In yet another example, Defendant Officers actions here are akin to the case of *Est. of Ceballos*, 919 F.3d 1204. In that case, officers shot Jaime Ceballos within a minute of arriving on scene. All because he was *probably* high on drugs and was certainly "acting crazy." Officers approached Ceballos, shouted commands, and then drew their weapons (here, a Taser and firearm). The officers fired their respective weapons nearly simultaneously—to "contain him and prevent him from running away and endangering the public." *Est. of Ceballos*, 919 F.3d at 1211. The court of appeals determined that clearly established Tenth Circuit case law provided an objective officer notice that this conduct violates the Fourth Amendment. *Id.* at 1215–17.

However, the facts and circumstances in *Allen* and *Est. of Ceballos* provide stronger justifications for the use of deadly force in those cases. In one, the suspect was *known* to be armed with a gun. The other with multiple bats (and perhaps a pocketknife). Both of these cases involved legitimate weapons—weapons capable of harming someone from much greater distances and with greater lethality than Thomas' bow, shield, or doll. Further, in the instant case, the events unfolded inside Mr. Willis Gay Jr.'s home where there were no members of the public to protect. This makes Defendant Officers' use of force against Thomas even less justified.

Finally, it's worth noting that Officer Pitts shot Thomas twice and there is evidence in the record—from Officer Lewis—supporting the notion that both shots were fired within about a second. *See* **Doc. 77 at ¶ 54** (citing **Doc. 77-1**). She fired this second (ostensibly fatal) shot into an unarmed Thomas who was unable to escape and presented no danger to the public. Under *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013), Defendant Officers were on notice that even a suspect who grabs at an officer's duty weapon cannot be indiscriminately shot and that's because "circumstances may change within seconds eliminating the justification for deadly force." *Id.* at 1200 (quoting *Durastanti*, 607 F.3d at 666). Even if Officer Pitts thought Thomas was holding something, it was undoubtedly a violation of clearly established law to shoot him the second time again, without any warning.

In sum, upon viewing the facts in the light most favorable to Plaintiff, Defendant Officers violated clearly established law. A jury could find: (1) Officer Lewis tased Thomas when a reasonable officer would have known Thomas was unarmed and posed no threat, and (2) Officer Pitts shot Thomas when a reasonable officer would have known Thomas was unarmed and posed no threat. Additionally, the fact that—according to Plaintiff (**Doc. 2 at ¶¶ 1, 18–20, 29–35, 47, 50**)—both Defendant Officers "fail[ed] to intervene and prevent another law enforcement official's use of excessive force," means they *could* also be liable for both violations of clearly established law. *See, e.g., Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996); *Est. of Booker*, 745 F.3d at 422–23; *Serrano v. United States*, 766 F. App'x 561, 570 (10th Cir. 2019) (unpublished); *Routt v. Howard*, 764 F. App'x 762, 767–68 (10th Cir. 2019) (unpublished).[32]

## IV. Defendant City is Not Entitled to Summary Judgment

As a precursor to establishing municipal liability, Plaintiff must prove an underlying

---

[32] At this juncture, the Court does not decide whether Plaintiff met the pleading requirement for an alleged failure to intervene. *See Fogarty*, 523 F.3d at 1165. This issue was not briefed.

violation of a constitutional right. *See Est. of Larsen*, 511 F.3d at 1264. This much has been established. Accordingly, the Court now pivots to Plaintiff's municipal liability theories based on Defendant City's "fail[ure] to train and supervise its officers." **Doc. 78 at 17**.

### A. Additional material facts

In addition to the facts outlined in the filings related to Defendant Officers' motion for summary judgment, Plaintiff details additional facts against Defendant City. As required, the Court views the evidence in the light most favorable to Plaintiff—as the nonmovant. *McCoy*, 887 F.3d at 1044. The following facts to Plaintiff's narrative are added:

### 1. June 1, 2019

*On June 1, 2019, law enforcement personnel from BPD were dispatched to the home of Mr. Willis Gay Jr. . . . . Without any further commands, Thomas was tased. And Officer Pitts unholstered and drew her service weapon . . . . Officer Lewis tased Thomas (at least) once more . . . . [and] Officer Pitts shot Thomas twice in quick succession.*[33]

But for Officer Lewis deploying the Taser, Officer Pitts would not have drawn her weapon. **Doc. 78 at ¶ 29** ("AMF"). *See* **Doc. 78-4**.

### 2. A few days later

Two days after the shooting, the BPD Chief requested an internal investigation be conducted. **AMF ¶ 30** (citing **Docs. 78-9 & 78-10**). The investigation revealed that neither Defendant Officer violated BPD policies. **AMF ¶ 31** (citing **Docs. 78-12 & 78-13**). A "Use of Force Review Board" was never convened—even though it is required by BPD policy. **AMF ¶ 32**(citing **Doc. 78-14**). Additionally, Officer Lewis did not complete a "Taser Device Report Form" even though that was required by BPD Policy. **AMFs ¶¶ 33 & 34** (citing **Docs. 78-15 &**

---

[33] These facts are an abridged version of what was discussed at *supra* ¶ "**Undisputed Material Facts**."

**78-16**). In fact, BPD never downloaded the Taser data. **AMF ¶ 35** (citing **Doc. 78-6**).

### 3. History of training and policies at BPD

At the time of the shooting, BPD implemented a written policy that dictated only individuals who "have successfully completed department-approved training may be issued and may carry the TASER device." **AMF ¶ 40** (citing **Docs. 78-15 & 78-16**). The BPD Taser Policy also requires annual proficiency training. *See id.* Prior to June 1, 2019, Officer Lewis had not received any training from BPD related to the use of a Taser. **AMF ¶ 41** (citing **Docs. 78-3 & 78-16**). Officer Lewis was never trained on the use of a Taser—and BPD did not have any record that Officer Lewis was ever certified to use a Taser. **AMF ¶ 42** (citing **Docs. 78-16 & 78-18**). Nationally recognized police guidelines dictate that officers must be properly trained before being issued and using a Taser. **AMF ¶ 43** (citing **Doc. 78-20**). Because Officer Lewis lacked proper certification and training, he should never have been carrying a Taser. **AMF ¶ 44** (citing **Docs. 78-15, 78-16, 78-17, 78-20**).

BPD's Taser Policy dictates that the training coordinator should conduct audits of data downloads and reconcile TASER device report forms with recorded activations. **AMF ¶ 51** (citing **Doc. 78-15**). But this was "a work in progress" that "hasn't been overseen the way that it should have been." **AMF ¶ 52** (citing **Doc. 78-17**).

BPD's Use of Force Policy dictates annual reports be prepared. **AMF ¶ 48** (citing **Docs. 78-16 & 78-21**). But BPD does not adhere to that policy. **AMF ¶ 49** (citing **Docs. 78-16 & 78-18**). Because BPD did not conduct regular reviews on use of force incidents, BPD was never to identify any such trends. **AMF ¶ 50** (citing **Doc. 78-16**).

Regarding de-escalation training from BPD, Officer Lewis stated he received "on-the-job-type stuff." **AMF ¶ 38**. That being said, his "Daily Training Bulletin Log" reveals no such

trainings. **AMF ¶ 39** (citing **Doc. 78-17**). *See also* **Doc. 68-1**.[34]

Chief Tracy Roles took over as Chief of Police on October 1, 2018. **AMF ¶ 45** (citing **Doc. 78-16**). He described BPD as being in "disarray and in need of a reboot." **AMF ¶ 46** (citing **Doc. 78-16**).

### 4. Use of force review board

Brian Brewington served as the BPD training coordinator from 2010–2016. **AMF ¶ 53** (citing **Doc. 78-22**). Brewington served on the BPD "Use of Force Review Board." *Id.* According to Brewington, the Review Board initially met once a month to review 4–5 use of force incidents. **AMF ¶ 56** (citing **Doc. 78-22**). Back then, the board would review the packets and call the officers in—whenever the board had specific questions. *Id.* But Brewington explained that in 2017, the Board stopped meeting. **AMF ¶ 57** (citing **Doc. 78-22**).

Because of these poor practices, Brewington sent in his resignation from the Board. **AMF ¶ 58** (citing **Docs. 78-22 & 78-23**). Specifically, Brewington resigned from the board in August 2018 after being handed a "large amount of use of force files" and being asked to sign/approve the reports as soon as possible. **AMF ¶ 54** (citing **Doc. 78-22**). In addition to these files, Brewington was also aware of numerous other instances of BPD officers using force that were not included. **AMF ¶ 55** (citing **Doc. 78-22**).

Brewington included the City Manager, Michael Bailey, on his email resigning from the Board. **AMF ¶ 60** (citing **Doc. 78-23**). Rocky Bevard, the police chief back then, accepted Brewington's resignation. **AMF ¶ 59** (citing **Doc. 78-24**). The City Manager responded to Brewington that he, too, was "a little concerned" about the lack of investigations. **AMF ¶ 60**

---

[34] Officer Lewis did not complete any training titled "de-escalation." Prior to June 1, 2019, he completed courses titled: Crisis Intervention, Emotional and Psycho Dis 1, Communications Skills One, and Suicide Prevention in LE.

(citing **Doc. 78-25**). After his resignation, Brewington never observed the Board meet. **AMF ¶ 62** (citing **Doc. 78-22**).

At the time Brewington resigned, the chair of the Board was Kevin Ickleberry. **AMF ¶ 61** (citing **Doc. 78-22**). Currently, both Ickleberry and Bevard are members of BPD's "command staff." **AMF ¶ 61** (citing **Doc. 78-18**).

* * *

There facts are not meaningfully disputed by Defendant City. *See* **Doc. 86**. The City's first argument is that Plaintiff's additional facts are "largely repetitive of Defendants['] statement of facts." *Id.* **at 2**. Next, the City argues that additional facts "29, 39, 43, 44, and 48 through 62 are not material." *Id.* But "[c]ontending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact." *SFF-TIR, LLC v. Stephenson*, 452 F. Supp. 3d 1058, 1073 n.14 (N.D. Okla. 2020). The only fact Defendant City properly disputes is **AMF ¶ 42**—regarding Officer Lewis' Taser training. *See* **Doc. 86 at 2** (citing **Docs. 86-2, 86-3, 86-4**). But, at this stage in the proceedings, this factual dispute must be resolved in Plaintiff's favor. *See Interstate Med. Licensure Compact Comm'n v. Bowling*, 113 F.4th 1266, 2024 U.S. App. LEXIS 22093, at *30 (10th Cir. 2024). There is some evidence indicating that BPD was unaware of Officer Lewis' Taser certification or training. *See* **Docs. 78-16 & 78-18**.

All this to say, the facts set forth in Plaintiff's Response (Doc. 78) are deemed admitted— because they were not specifically controverted by Defendant City. *See* N.D. Okla. LCvR56.1(c)– (e); *see also Taylor v. Riverside Behav. Health*, No. 10-cv-243, 2011 U.S. Dist. LEXIS 43000, at *2 n.3 (N.D. Okla. Apr. 20, 2011) (explaining a party must "specifically controver[t]" the opposing party's material facts in accordance with the local rules) (alteration in original). Having failed to place any facts in dispute, Defendant City's motion (**Docs. 69 & 86**) is not well-taken.

### B. Analysis of municipal liability claim

A plaintiff suing a municipality under § 1983 for the acts of its employees must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional violation. *Cavanaugh*, 625 F.3d at 667. Plaintiff easily meets this requirement.

Municipal liability for customs and policies, as alleged, can take numerous forms including: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may result. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

At the end of the day, in order to demonstrate § 1983 liability, Plaintiff must point to prior similar violations that would have put Defendants on notice. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019). After pointing to a municipal policy or custom, Plaintiff must also demonstrate "a direct causal link between the policy or custom and the injury alleged." *Bryson*, 627 F.3d at 788. This causation element is applied "with especial rigor" with respect to inadequate training or supervision. *Waller*, 932 F.3d at 1284 (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)). Finally, Plaintiff must demonstrate the municipal action was taken with "deliberate indifference" as to its now or obvious

consequences. *Waller*, 932 F.3d at 1284 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)).

With this legal framework in mind, the Court now considers Plaintiff's alleged theories of liability: (1) failure to train and (2) failure to supervise. **Doc. 78 at 18–25**. *See also* **Doc. 2 at ¶¶ 38, 41, 42, 57, 59, 60**).

### 1. Failure to train

Plaintiff first argues Defendant City acted with deliberate indifference when it failed to train its officers on the Taser. **Doc. 78 at 18**. Here, Plaintiff has sufficiently proved: (1) the training was inadequate, (2) Defendant Officers exceeded constitutional limitation on the use of force, (3) the use of force arose during a routine situation, (4) the inadequate training demonstrates deliberate indifference toward persons with whom the police come into contact, and (5) there is a direct causal link between the constitutional deprivation and the inadequate training. *See Carr*, 337 F.3d at 1228.

First, there is no doubt that Officer Lewis received inadequate Taser training. *See supra* ¶ IV.A.3. Second, the Court already decided that Defendant Officers violated Thomas' clearly established constitutional rights. *See supra* ¶ III. Third, the use of force arose under a routine call. *See supra* ¶ IV.A.1–3. Fourth, inadequate training on a Taser shows deliberate indifference by Defendant City.[35] *See supra* ¶ IV.A.2–3. Defendant City had a Taser Policy but did not enforce it.

---

[35] United States District Judge Wiley Daniel found deliberate indifference in a scenario where the officers had "received ample training . . . by a qualified instructor," but were not "adequately trained with respect to the Taser in dealing with the mentally ill [or], individuals under the influence of narcotics." *Est. of Mathis v. Kingston*, No. 07-cv-2237, 2009 U.S. Dist. LEXIS 32040, at *18 (D. Colo. Apr. 16, 2009). *See also Buben v. City of Lone Tree*, No. 08-cv-127, 2010 U.S. Dist. LEXIS 104853 (D. Colo. Sept. 30, 2010); *Douglas v. Reddy*, No. 08-cv-1372, 2010 U.S. Dist. LEXIS 157697 (D. Kan. Jan. 21, 2010).

The question presented in those cases—and in this case—is whether such inadequate training can justifiably be said to represent "city policy." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). It can.

"[I]n light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers

Nor did the City ensure that its officers undertook Taser training. This was in contravention with nationally recognized police guidelines. Even Chief Roles acknowledged that Taser training "wasn't being overseen" properly and was "a work in progress." **Doc. 78-18**. Fifth, and finally, there is a direct causal link between the constitutional deprivation and the inadequate training. *See supra* ¶ IV.A.1. But for a lack of training, Officer Lewis would not have repeatedly deployed his Taser on Thomas. And but for Officer Lewis deploying the Taser, Officer Pitts would not have drawn her weapon. **AMF ¶ 29**. And absent the drawing of her weapon (preconditioned on Officer Lewis immediately drawing his Taser), Officer Pitts would not have shot Thomas twice.

### 2. Failure to supervise

Plaintiff also argues that Defendant City failed to supervise its officers on their use of force. **Doc. 78 at 22**. Specifically, Plaintiff alleges "the City's failure and/or refusal to review instances whereby its officers use force against suspect constitutes deliberate indifference by failing to ensure that improper uses of force are curbed." *Id.* **at 23**.

Here, Defendant City had an established practice of ignoring instances where its officers used force. The City was notified and it failed to remedy the situation. At the very least, Brewington's email in August 2018 informing the Chief of Police and City Manager put Defendant City on notice. Plaintiff has sufficiently plead and argued that Defendant City "ignored" these reports and failed to act. **Doc. 78 at 22–25**; **Doc. 2 at ¶¶ 41, 42, 59, 60**. These actions constitute deliberate indifference. *See infra* ¶ IV.A.3–4.

\* \* \*

Based on the pleadings filed by the parties relating to Defendants' Motions for Summary

---

of the city can reasonably be said to have been deliberately indifferent to the need . . . . [and] in that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible." *Id.*

Judgment, the Court finds that the undisputed evidence establishes that Defendant City wholly failed to ensure that Defendant Officers were properly trained on: (1) de-escalation, (2) carrying and use of a Taser, and (3) use of deadly force. *See supra* ¶ IV.A. Plus, the agreed-upon evidence makes clear, Defendant City failed to supervise its officers regarding the use of force and failed to properly investigate or review use of force by BPD officers. Clearly, summary judgment is inappropriate in this case.

## CONCLUSION

Construing the facts in the light most favorable to the party against whom summary judgment is sought, here the Plaintiff as the Personal Representative of the Estate of Thomas Gay, deceased, and drawing all reasonable inferences in favor of the Plaintiff as the nonmoving party for summary judgment, the Court finds and concludes that:

(i)     Defendant Officers' use of force against Thomas Gay was unreasonable under *Graham*, *Larsen*, and the totality of the circumstances.

(ii)    Defendant Officers' actions violated Thomas Gay's constitutional rights.

(iii)   Thomas Gay's right to be free from excessive force was clearly established at the time of the alleged misconduct and this conclusion is supported by the holdings of the Tenth Circuit Court of Appeals in *Hastings*, *Allen*, *Zia Tr.*, and *King* (amongst others).

(iv)    A reasonable officer, faced with the circumstances here—and presumptively aware of previous decisions in the Tenth Circuit—would have known that expeditiously drawing weapons, giving a singular command, and then cornering Thomas Gay in the bedroom of his father's house might recklessly or deliberately escalate the situation, such that any officer's ultimate use of deadly force would be

unconstitutional.

Moreover, the Court finds and concludes that Plaintiff adequately pleaded a viable cause of action against Defendant City for municipal liability based on a failure to train and a failure to supervise.

**IT IS THEREFORE ORDERED** that:

(i) Defendant Officers' Motion for Summary Judgment (**Doc. 68**) is **DENIED**; and

(ii) Defendant City's Motion for Summary Judgment (**Doc. 69**) is, likewise, **DENIED**.


/s/ _____
WILLIAM P. JOHNSON
UNITED STATES DISTRICT JUDGE